427 So.2d 625 (1983)
Donald MULLER and Petroleum Transport Company
v.
RAMAR, INC., Mr. and Mrs. Joseph Bulot and Rene Jacomine, et al.
No. 5-369.
Court of Appeal of Louisiana, Fifth Circuit.
February 7, 1983.
Rehearing Denied March 17, 1983.
*626 Graffagnino, Perez & Roberts, A. Russell Roberts, Metairie, for Donald Muller and Petroleum Transport Co. plaintiffs-appellees.
The Law Offices of Daniel E. Becnel, Jr., Reserve, and William M. Detweiler, J.D., New Orleans, for Ramar, Inc., Mr. and Mrs. Joseph Bulot and Rene Jacomine, et al., defendants-appellants.
Before BOUTALL, CHEHARDY and GAUDIN, JJ.
BOUTALL, Judge.
This suit arises from the alleged violation of a "no competition" clause in the act of sale of a trucking and hauling business. From a judgment in favor of the plaintiff, the defendants have appealed.
On January 8, 1979, Donald Muller purchased from Rene Jacomine and Joseph Bulot, his son-in-law, all the outstanding stock of two corporations, Petroleum Transport Company (Petroleum) and Rajac, Inc., whose principal business was transporting petroleum products within the State of Louisiana. Jacomine signed the act of sale as holder of 751 shares of Petroleum and as sole shareholder of Rajac, Inc., while Joseph Bulot signed as holder of 749 shares of Petroleum. The act of sale provided that:
"As a further consideration of this sale, Vendors agree for a period of five (5) years after the date thereof, not to directly or indirectly compete with Donald A. Muller, the Purchaser herein, in the operation of the business heretofore operated and engaged in by said Vendors, in the name of RAJAC, Inc. and Petroleum Transport Company. Indirect competition shall be deemed to include Vendors' position as a shareholder, partner, officer, agent or (sic) of any competing business. Any violation of this covenant shall enable the said Donald A. Muller, his heirs, successors and assigns to pursue any remedy, against the said Vendors in a court of competent jurisdiction to enjoin the said Vendors from further breach of said covenant, in the operation of any business in conflict therewith, and for damages resulting from the breach of said covenant, including a reasonable attorney's fee."
The purchase price of the business was $300,000, with a down payment of $50,000 in cash and a promissory note for the balance of $250,000.
In April, 1981, Mrs. Rachel Bulot began organizing a hauling business which went into operation in May. She reactivated a dormant corporation, Ramar, Inc., which she and her husband Joseph had incorporated about ten years earlier. Mrs. Bulot entered the hauling business on her own upon learning that Charter Marketing Corporation (Charter), a major account of Petroleum's, was considering withdrawing its hauling account for a large section of Louisiana. An official of Charter had approached Mr. Bulot on the possibility of his taking over the account. Mr. Bulot replied that he could not but that his wife might be interested. Charter subsequently accepted a proposal from Ramar and became its principal account. Mrs. Bulot alleges that she is now the sole shareholder of Ramar, Inc., Mr. Bulot having resigned as president and returned his stock to the corporation. On or about April 23, 1981, Mr. and Mrs. Bulot entered into a matrimonial contract, providing that henceforth they would be separate in property, however no accounting or division of prior-owned property was made.
On June 19, 1981 Muller and Petroleum filed a petition for a permanent injunction and damages against Ramar, Mr. and Mrs. *627 Bulot, Rene Jacomine, and DOTCO, the lessee of trucks and trailers from Ramar. Inter alia, the plaintiffs alleged that: the shares of Petroleum stock sold by Mr. Bulot to Muller were community property; that the defendants violated the sales contract by competing directly with Petroleum and plundering the company; that Ramar was controlled by Mr. and Mrs. Bulot, who were its incorporators, officers, directors and shareholders; and that Ramar, Inc. was the alter ego of the shareholders, enabling them to do what the agreement not to compete prohibited.
The trial court found in favor of the plaintiffs and enjoined the defendants from competing with Petroleum Transport Company and Donald Muller. Damages were denied, but the defendants were cast for all costs, including an attorney's fee of $3,000. DOTCO was dismissed from the suit. After the defendants took a suspensive appeal, the court issued a stay of the injunction.
In his reasons for judgment the trial judge said:
"The testimony and exhibits adduced at trial make it necessary that this court pierce the corporate veil. Once pierced it becomes apparent that Ramar, Inc., and Rachel Jacomine Bulot are the alter ego of both, Joseph Bulot and Rene Jacomine."
The issues before us are first, whether the court correctly applied Louisiana corporate law in respect to piercing the corporate veil, and second, whether the court was correct in finding that actions of Ramar, Rachel Bulot, Joseph Bulot, and Rene Jacomine constituted a breach of the covenant not to compete.
In alleging that Ramar is the "alter ego" of Rene Jacomine and Joseph Bulot, the plaintiffs attempted to prove that Jacomine and Bulot were as involved in the business as was Mrs. Bulot. Jacomine testified that he began a boat business in May, 1981, and knew nothing of his daughter's starting a hauling business until he saw trucks in her yard. No documentary evidence or testimony indicated that Jacomine financed the corporation or benefited from it. Joseph Bulot insisted that he himself had no part in Ramar, although he did sign a continuing guarantee in connection with the purchase of vehicles by the corporation and signed a collateral mortgage agreement pledging his share of the balance of the $250,000 note of Petroleum and his interest in the family home.
The doctrine of "alter ego" usually comes into play when an individual is seeking to avoid personal responsibility for debts or obligations of a corporation owned by him. Under certain circumstances a court may "pierce the corporate veil" to find the individual shareholder or shareholders liable. A succinct statement of the law is found in Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280 (La. App. 1st Cir.1976), at 1282:
"There are ... limited exceptions to the rule of non-liability of shareholders for the debts of a corporation whereby the court may ignore the corporate fiction and hold the individual member or members liable. In such situations courts commonly refer to the corporation as the `alter ego' of the shareholder. One such exception to the non-liability rule involves situations where fraud or deceit has been practiced on a third party by the shareholder acting through the corporation. La.R.S. 12:95; Bossier Millwork & Supply Company v. D. & R. Construction Company, Inc., supra. [245 So.2d 414 (La. App. 2d Cir.1971)]
"Another basis for disregarding the corporate entity involves the failure to conduct a business or corporate footing, thereby disregarding the corporate entity to such an extent that the corporation ceases to be distinguishable from its shareholders. Gordon v. Baton Rouge Stores Company, 168 La. 248, 121 So. 759 (1929); Brown v. Benton Creosoting Company, 147 So.2d 89 (La.App. 2d Cir. 1962)...."
Kingsman is quoted at length by defendant, along with other cases explicating the concept of "alter ego". The plaintiff submitted no jurisprudence in rebuttal but stated that it "... simply adopted the citations *628 in plaintiff's brief ...," relying on the facts alone to prove its case. A careful search of the jurisprudence has revealed no case in which a corporation and its sole shareholder have been adjudged to be the alter ego of individuals who are not shareholders. The alter ego doctrine has, however, been applied in cases of multiple interrelated corporations. See, for instance, Miss. River Grain Elev. v. Bartlett & Co., Grain, 659 F.2d 1314 (5th Cir.1981) and cases cited therein.
We find that, as plaintiffs have introduced no evidence to show that Jacomine and Bulot are actually shareholders, officers, or directors of Ramar, and as personal liability for corporate debts is not at issue, the doctrine of alter ego cannot be applied to them under the facts of this case. Instead we look to the terms of the agreement and the actions and legal relationships of the parties. Rachel Bulot insists she is the sole shareholder of the corporation, and accordingly, to determine whether Rachel Bulot's entry into the hauling business constituted a breach of the covenant, we must consider whether she was included in the agreement not to compete.
The plaintiff's petition alleges that the 749 shares of Petroleum stock that Joseph Bulot transferred to Muller in 1979 were community property. If that allegation is true, then Rachel Bulot was subject to the covenant not to compete, even though the stock was not registered to both husband and wife and she did not sign the act of sale. In transferring his shares, Mr. Bulot would have acted as head and master of the community, as La.C.C. art. 2404 had not then been repealed.
The act of sale took place in January, 1979, prior to the marital contract and during the existence of the community of acquets and gains between Mr. and Mrs. Bulot. The testimony is confusing as to the sequence of events in the issuance and transfer of stock, and only one original certificate was produced at trial.[1] Jacomine testified that up until the day of the sale he owned 100% of the stock, 1500 shares. Certificate # 1 for 1500 was issued March 14, 1971. On August 17, 1971 Jacomine endorsed it and it was broken into one certificate, # 2 for 500 shares, and one for 1,000, unnumbered, both certificates being pledged to the bank. Only the stubs were introduced into evidence. Whether or not Jacomine endorsed them back to the corporation is unclear. Mrs. Bulot testified that on the day of the sale she signed blank certificates that were filled in by the attorney afterward. Copies introduced into evidence are designated # 3 and # 4, for 751 shares and 749 shares, respectively, both dated January 3, 1977. Mr. Jacomine testified to direct questioning by his attorney:
"I owned 100 percent of the stock until that date; I told you that on that day I was giving my son-in-law, Mr. Bulot, 49 percent of the stock that you were going to issue49 percent of the new stock49 percent to Mr. Joseph Bulot and 51% to me."
The matrimonial agreement was not introduced into evidence, but the parties agreed that it was entered into in April, 1981. The issue of shares to Joseph Bulot clearly took place during the existence of the community.
LSA-C.C. articles 2334 and 2402 were in effect in 1979 and provided that property acquired during the community is an asset of the community. Regardless of whether husband or wife is the registered owner of an asset, there was in 1979 and is now a presumption in Louisiana law that any property acquired during a community is an asset of the community, and in a contest the burden of proof falls upon the spouse claiming an asset as his separate property.

*629 "... This burden is satisfied only when it is proved that the property was acquired and paid for with separate funds, and that proof must be strict, clear, positive and legally certain. Fleming v. Fleming, 211 La. 860, 30 So.2d 860 (1947); Succession of Hemenway, 228 La. 572, 83 So.2d 377 (1955); and Succession of Hollier, 158 So.2d 351 (La.App. 3rd Cir.1963)." Succession of Hyde, 281 So.2d 136 (La. App. 3rd Cir., 1973), at 140.
No evidence was produced to indicate that Mr. Bulot had invested separate funds in the company or had, in fact, purchased the stock from Jacomine with separate funds. Both spouses had worked continually in the company, at least from 1971, devoting their time and energies to the business. Mrs. Bulot retired as of December 31, 1980. (Mr. Bulot had entered into a contract to remain with Petroleum after the sale but was terminated when Petroleum became aware of Mrs. Bulot's new company.) Mrs. Bulot further testified that Mr. Bulot's share of the $50,000 cash payment from the sale was deposited in their joint checking account.
Civil Code article 2334 provides that separate property may be acquired by either spouse "... by donation made to him or her particularly...." Two statements in the testimony are to the effect that 749 shares were a gift to Joseph Bulot alone. Mr. Jacomine, whose testimony is quoted above, stated that he gave his son-in-law 49% of the Petroleum stock on the day of the sale. Mrs. Bulot stated that her father gave the stock to Mr. Bulot because, "My husband, a long way back, had bought into a trucking firm with my father." Joseph Bulot was not questioned in regard to a donation.
In Smith v. Smith, 311 So.2d 514 (La.App. 3rd Cir.1974), the issue of ownership of stock in a family grocery chain was considered exhaustively by the court. David Smith, the defendant, was the registered owner of the shares and attempted to prove that the stock was his separate property. Despite his father's testimony that he had put up all the money for one of the businesses and that he gave the stock to his son, the court found that there was no donation, but that the shares were issued to David Smith as consideration for his management. In Primeaux v. Libersat, 322 So.2d 147 (La. 1975), the Supreme Court held, that although there had been some informalities in the issuing and transfer of shares in a family business from father to son, the shares were the son's separate property. The son was an employee of the corporation, but the evidence clearly proved the father's donative intent.
We find that the defendants have failed to prove that Rene Jacomine intended to donate stock in Petroleum to Joseph Bulot as his separate property; therefore, Rachel Bulot owned a community interest in Bulot's 749 shares.
We consider also whether Joseph Bulot has a community interest in Ramar, Inc. Both Joseph and Rachel Bulot testified that he resigned as president of Ramar and that he returned his stock to the corporation. No corporate records were introduced into evidence, and the testimony is conflicting and vague.
Mr. Bulot's responses to questioning regarding the divestiture of stock are as follows:
"I think it was in March of '81."
"I informed them, at a board of directors' meeting which Mr. William Detweiler attended, that I was resigning as president, and that I was relinquishing my stock to the corporation, but no one in the company had no assets or no liabilities."
Mrs. Bulot testified that the divestiture and resignation took place sometime in the early part of April. She testified that the stock went back into the corporation and then into her name. She was unclear as to the mechanics of the transfer:
"I don't know how the attorney handled it. I just know that it was turned back over to the corporation."
Neither Mr. nor Mrs. Bulot knew how many shares were issued but agreed that they each previously owned half. As no documentary proof of the above transactions *630 was introduced into evidence, we find that the defendants have failed to overcome the presumption that Ramar, Inc., was a community asset on April 30, 1981, when Ramar and Charter entered into a hauling contract.
We find that both Rachel Bulot and Joseph Bulot breached the covenant not to compete for the following reasons: Mrs. Bulot was shareholder in community in Petroleum at the time of the act of sale; and, Mr. Bulot was a shareholder in community in Ramar, Inc., at the time Mrs. Bulot entered the hauling business and continued his activities by giving the financial support necessary to place the business in operation. We do not find the evidence conclusive of Rene Jacomine's being a participant in Ramar and violating the covenant.
Accordingly, we affirm the judgment dismissing the suit against DOTCO; enjoining defendants Ramar, Inc., Rachel Jacomine Bulot and Joseph Bulot from competing with plaintiffs; denying other demands of plaintiffs; and casting defendants for all costs, including an attorney's fee of $3,000.00. We reverse as to defendant Rene Jacomine.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] The total number of shares authorized in the incorporation of Petroleum Transport Company was 1500. The certificates (copies) produced in court indicated that 3,000 shares had been issued; however, it appears that the discrepancy was due to careless record-keeping in regard to stock issuance and transfer. The defendants stipulated that all outstanding stock had indeed been transferred to Muller.