477 So.2d 148 (1985)
In the Matter of the SUCCESSION OF Hollis Womack LINDSEY, Jr.
No. 84CA0806.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
*150 John Parker, Baton Rouge, and Charles M. Reid, Amite, for plaintiff-appellee, Executor of the Estate-Edwin C. Schilling, Jr.
Donald C. Brown, John P. Everett, Jr., David R. Frohn, Lake Charles, for defendant-appellant, Mrs. Jeanne Gardner Lindsey.
Duncan Smith, Lafayette, for defendant-appellee, Doris Rhodes, Nenie Dyson, and Helen Laird.
Before GROVER L. COVINGTON, C.J., WATKINS, SHORTESS, JJ.
SHORTESS, Judge.
Jeanne Gardner Lindsey (plaintiff-appellant) filed suit opposing the final account of her husband's olographic will as proposed by the testamentary executor, Edwin C. Schilling, Jr. (defendant-appellee). She objected to the designation of some of her husband's property as separate rather than community, distribution to some particular legatees of bequests free of her testamentary usufruct, and giving effect to a mineral proceeds sharing agreement between the decedent and his sisters. Decedent's sisters, Nenie Lindsey Dyson, Helen Lindsey Laird and Doris Lindsey Holland Rhodes (plaintiffs-appellees) also filed an opposition to the final account, objecting to the designation of approximately $40,000.00 in Certificates of Deposit as community rather than separate funds.
The trial court, with oral reasons, found that:
(1) the serially numbered Certificates of Deposit were decedent's separate property at the time of his marriage to appellant;[1]
(2) the particular legacies to Yvonne Gross, Dorothy Jean Peroyea and Katherine Price were subject to the widow's usufruct but not the cash bequests to Vivian Noel and the Greensburg Cemetery Association nor bequests of personal items and family heirlooms to Jules R. Lindsey, James Stafford and Dyson;
(3) the mineral lease was decedent's separate property, but its proceeds (fruits) belonged to the community until its termination and upheld the executor's determination that the widow was entitled to 70% of the mineral proceeds under the terms of the testamentary usufruct; Humble Oil & Refining Company v. Lewis, 245 La. 499, 159 So.2d 132 (1963), and Whatley v. Whatley, 439 So.2d 444 (La.App. 2nd Cir.1983); and
(4) the sharing or pooling agreement was neither against public policy nor illegal, with the right of each party to terminate the agreement by the sale of his property not an LSA-C.C. art. 2024[2] purely potestative condition but a "termination privilege" as provided in LSA-C.C. art. 2036.[3]
The issues on appeal are:
(1) whether the testamentary lifetime usufruct given to the surviving widow by decedent included the legacies to other relatives;
(2) whether the Certificates of Deposit in question, the mineral lease and its fruits and property allegedly bought from his co-heirs by decedent during the existence of the community were community or separate property; and
*151 (3) whether the agreement to share mineral proceeds conf ected by decedent and his sisters is valid and should be followed in dispersing mineral proceeds received by the executor after termination of the community.

FACTS
Hollis Womack Lindsey, Jr. (decedent) died October 8,1982. He had been married twice, first to Marguerite Holland Lindsey, who predeceased him, and second to Jeanne Gardner Lindsey (plaintiff-appellant), the surviving widow. He had no children, and his parents predeceased him. Decedent's second marriage took place on October 8, 1977. Decedent had signed, dated and handwritten a will in olographic form on April 17, 1980, revoking all prior wills, including a statutory will dated November 17, 1977. The olographic will and its March 10, 1981, codicil were probated and several legatees had been placed in possession of some assets, when the widow and three of decedent's sisters opposed the succession executor's final account.
The will was divided into five internally inconsistent parts (A through E).
A. Decedent requested payment of his debts.
B. He left his wife all of his money in checking and savings accounts in City National Bank and Union Federal Loan Association, his residence, all cars and life insurance, plus the remainder of his furniture and appliances not willed to others.
C. His wife was given a lifetime testamentary usufruct without bond of all of his movable and immovable property.
D. Money from timber sales and "proceeds from any rentals royalties and other proceeds" were to go 70% to his widow and 30% to his brother Jules, with his widow to get it all if predeceased by Jules.
E.1. Decedent wrote: "Subject to the above mentioned usufruct, I make the following legacies": to Gross, a 1.6 carat diamond ring, sterling silver, chest and all serving pieces, plus photographs of her taken at different ages; to Peroyea, the china closet inherited from Lake; and to Price, Marguerite's afghan, cedar chest, back bedroom bed headboard only, "two nite tables ... willed to Marguerite by Lillie," desk from the Blind school, her rocking chair, and two cane-bottomed straight chairs.
E.2. The language in the next bequests was different. Decedent returned to the use of "I will and bequeath" in giving $1,000.00 cash each to Vivian Noel and the Greensburg Cemetery Association "in memory of the Lindsey and Holland families," with the request that the Cemetery Association invest the money, using only the interest for upkeep.
E.3. The writing style again changes, with a reference to the fact that all of his separate property either inherited or bought from co-heirs "shall be subject to the usufruct in favor of my wife as set forth above," with the naked ownership willed equally to Etna L. Stafford, Rhodes, Dyson, Laird and Jules.
E.4. Certain movables were willed and bequeathed as follows: to Jules, lifetime usufruct of father's gold watch and chain, with naked ownership of it to Stafford, who would also receive his Masonic watch, chain and ring (without the diamond to be given to Gross); "all other money and Std. Oil N.J. stock" one-half in equal portions to his brother Jules and sisters and the other half in equal portions to eight other relatives; and the final paragraph left "all other property of which I may die possessed" to Dyson, with the request that she "use her judgement in giving each one something." The codicil of March 10, 1981, changed the bequest of Standard Oil of New Jersey stock to his wife.
The will is contradictory in granting the wife's usufruct and in dealing with the remainder of decedent's property. In Part C, the wife's usufruct is granted over all movables and immovables; in Part E3, decedent's separate property is made subject to the usufruct in favor of his wife "as set forth above;" and, in Part E1, the legacies to Gross, Peroyea and Price were made subject to the "above" usufruct. However, the testator specified in Part D that money *152 from timber sales and rentals and royalty proceeds was to be given 70% to his wife and 30% to Jules, and he used distinctly different language in Parts E2 and E4 to "will and bequeath" the cash legacies and family heirlooms. He also requested that the Cemetery Association use only the interest for upkeep and clearly divided the usufruct and naked ownership of his father's gold watch. Additionally, decedent willed the remainder of his estate to his wife in Part B and to Dyson in Part E4, with the request that she "give each one something."

USUFRUCT AND LEGACIES
The Civil Code requires courts to interpret wills by ascertaining the testator's intent, without departing from the proper signification of the will's terms and to understand a disposition in the sense which gives it effect. When terms are unclear, recourse may be had to all circumstances which help determine his intentions. When the will is contradictory, that which is last written is presumed to be the will of the testator, revoking previous contrary dispositions, with a general legacy not including those bequeathed in particular to other persons. LSA-C.C. arts. 1712, 1713, 1715, 1719 and 1723.
Decedent granted legacies under a universal title of all of his money in checking and savings accounts in City National Bank and Union Federal Loan Association, all cars, life insurance and Standard Oil of New Jersey stock to his wife; of timber and mineral proceeds to his wife and his brother Jules; of naked ownership of all of his separate property inherited or bought from co-heirs to Jules and four sisters; of all other money one-half in equal portions to Jules and four sisters and one-half in equal portions to eight other relatives; and all other property to Dyson. Particular legacies were those to Gross, Peroyea, Price, Noel, the Cemetery Association and the watches and rings to Stafford and Jules.
Decedent specifically mentioned that the legacies to Gross, Peroyea and Price were subject to the wife's usufruct, so his intent was clear and consistent with the prior grant of the wife's usufruct. However, the distinctly different language of willing and bequeathing the remaining particular legacies implies a different intent, especially since the general disposition is not to include the specific and these specific legacies were written after the sections on the wife's usufruct. Decedent showed his concern with keeping family heirlooms in the family by giving Stafford, the only other relative belonging to the Masonic Order, his Masonic jewelry and ultimate possession of his father's watch, after Jules enjoyed use of it during his lifetime.
Since Noel had worked many years for decedent and his first wife and was now elderly and in poor health, it is quite unlikely that this bequest was intended to come under the usufruct. And, although precatory language was used in requesting the use of interest only for cemetery upkeep, that language does indicate the testator's intent that the interest was to be used for the cemetery, not the usufructuary.
The trial court determined that the final disposition of all remaining property to Dyson was intended to include family memorabilia of both the Lindseys and his first wife. To assume otherwise would not give that disposition any effect.
These factors support the executor's proposals and the trial court's findings which were not clearly wrong. Decedent did not intend for these bequests to be subject to his wife's usufruct.

COMMUNITY VERSUS SEPARATE PROPERTY ISSUE
Since decedent and his second wife did not contract otherwise, they were deemed to be under the legal regime of the community of acquets and gains. At the testator's death in 1982, the Civil Code classified property as either separate or community, with its classification fixed at the time of its acquisition. Property cannot be classified as community after the community terminates, which occurs upon the death of a spouse. LSA-C.C. arts. *153 2334, 2335 and 2356. Whatley, 439 So.2d at 447. Property acquired during the existence of the community through either spouse's effort or that acquired with either community or both community and separate things (unless classified as separate property) is considered community property. Separate property includes that inherited, that acquired by a spouse prior to the establishment of the community, or that acquired with either separate or both separate and community things when the value of community things is inconsequential in comparison with the value of the separate things used. Fruits and revenues of separate property, including minerals, bonuses, delay rentals, royalties and shut-in payments arising from mineral leases are community property unless reserved as separate property by a declaration made in an authentic act or act under private signature duly acknowledged. LSA-C.C. arts. 2338-2342.[4]Whatley, 439 So.2d at 446-447.
There is a presumption in favor of the community unless either spouse proves things are separate property. The party asserting the separate nature of property acquired during the marriage has the burden of overcoming a strong presumption in favor of the community and must use proof that is strict, clear, positive and legally certain. LSA-C.C. art. 2340. Tullier v. Tullier, 464 So.2d 278, 283 (La.1985). Muller v. Ramar, Inc., 427 So.2d 625 (La.App. 5th Cir.1983); writ denied, 433 So.2d 1051 (La.1983).
With these principles in mind, we will treat the contested items of property as follows:

A. Certificates of Deposit (C.D.'s)
Three of decedent's sisters claimed that Capital Union Savings C.D. No. 0108516984, for $30,000.00 and C.D. No. 0108431043, for $10,000.00 were decedent's separate property, inherited from his first wife as three Capital Building and Loan C.D.'s in the amounts of $20,000.00, $10,000.00 and $10,000.00. Capital Building and Loan and Union Federal merged to become Capital Union Savings. Capital Union Vice-President Sterling Abernethy testified that extensive research showed decedent had the three C.D.'s prior to his October 8, 1977, second marriage. Although bank records no longer exist to show when the Capital Union C.D.'s were originally purchased, serial numbers enabled Abernethy to narrow the date to 1977. One of decedent's cancelled checks shows that the $20,000.00 C.D. was purchased on August 17,1977. Since the bank issued C.D.'s in numerical order, the prior serial numbers of the other two accounts indicate that they were opened earlier than the $20,000.00 account. In 1981, the $20,000.00 C.D. and one $10,000.00 C.D. were closed with penalty and transferred to the $30,000.00 C.D. The remaining $10,000.00 C.D. stayed intact through the period in question. Abernethy testified that when interest rates rose, investors paid penalties for premature withdrawal of funds, borrowed on the C.D.'s and re-invested them to receive higher rates of return. He assumed decedent had done this.
The trial judge indicated in his reasons for judgment that the community might have a cause of action for reimbursement of community funds used to enhance the separate property. In this regard, the appellant testified that decedent had used approximately $5,000.00 in community funds to repay the share loans, but the record as we have it to review failed to substantiate appellant's contention.[5]
The trial court was not clearly wrong in finding that the $40,000.00 in question was decedent's separate property. The chronology of serial numbers was clearly traceable, and were the only C.D.'s decedent had at Capital Union during the *154 whole period, and they remained intact while used as collateral for loans.

B. Mineral Lease
Appellant admits that decedent inherited the St. Helena Parish property prior to their marriage, but contends that the mineral lease created on that land during the existence of the community belonged to the community. All parties stipulated that decedent failed to reserve as separate property the fruits and revenues from that mineral lease. Appellees concede that mineral lease proceeds paid to decedent during the community's existence belong to the community, but insists that any payments made after his death do not.
Appellant argues that the trial judge erred as a matter of law in failing to consider the executor's heavy legal burden in proving the separate nature of the mineral lease, since the lease was executed in 1981, during the community's existence, and thus was presumed to be community property.
The trial court was not clearly wrong in holding that the mineral lease was decedent's separate property. The lease burdened his separate property and his mineral interests were created when he acquired the land. He and his family members signed the lease as the only parties legally capable of contracting concerning their own mineral interests. LSA-R.S. 31:15, 24. Civil Code article 2339 does not make the mineral lease community property, only the fruits and proceeds from it. Since the lease itself was not a presumed community asset, the trial judge correctly interpreted the law.

C. Delay Rentals
Appellant also claims that the delay rental check for $39,000.00 belongs to the community. The check is dated October 1, 1982, but was made payable to the depository bank and apparently received by it November 30, 1982. The community ended October 8, 1982. Delay rentals are given to the lessor to maintain a lease in absence of drilling, but do not constitute constructive production of minerals. Thus, the oil company has the option of paying delay rentals in lieu of drilling prior to December 2, 1982, to insure continuation of the lease. Contrary to appellant's argument, pension and retirement cases like T.L. James Co., Inc. v. Montgomery, 332 So.2d 834 (La. 1975) are not analogous, for there is no vesting of rights in delay rental payments.
Normally, delay rentals for a lease granted by the landowner prior to creation of the usufruct would go to the naked owner, with the usufructuary entitled only to royalties. LSA-R.S. 31:192, 213. Decedent's will, however, expressly provided that rental, royalty and other proceeds are to be divided 70%-30% between his widow and his brother. The Mineral Code permits such modifications to codal provisions. LSA-R.S. 31:2, 3. Since the status of property is fixed at the time of its acquisition, the check was correctly sent to the executor for disbursal according to the terms of the will. West v. Ortego, 325 So.2d 242 (La.1975); Whatley, 439 So.2d at 447.
The trial court was not clearly wrong in holding that these delay rentals were not community property and therefore subject to disbursal under the terms of the testamentary usufruct with 70% going to appellant and 30% going to Jules.

SHARING AGREEMENT
The executor's final account provided as follows:
As to any and all proceeds which may be received as royalty from production of oil, gas and mineral rights:
A. Give full effect to agreement entered into between Hollis W. Lindsey, Jr., Mrs. Doris Lindsey Holland Rhodes, Mrs. Nenie Lindsey Dyson, and Mrs. Helen Lindsey Laird, whereby they would share equally in any and all proceeds resulting from the production of oil, gas and other minerals on, in or under any of their respective parcels until December 1, 1988. Homologate Exhibit "A" annexed.
B. As to the portion due to Estate of Hollis W. Lindsey, Jr. give full effect to that provision in his will that said sum be paid 70% to Mrs. Jeanne G. Lindsey and *155 30% to Jules R. Lindsey, and proceeds from timber sales according to terms of will.
Appellant opposed this proposal and contended that the sharing agreement was invalid.
The trial court agreed with the executor and said:
The court finds, and rules, that the sharing agreement by Hollis Lindsey, Jr. and his sisters was certainly not against any public policy, nothing was illegal about the contract and obligation and that, in the opinion of this court, once the agreement was agreed upon and executed there was nothing that depended on any event which was in the power of one or the other of the contracting parties to bring about or to hinder. The court therefore finds and concludes that there was no purely potestative condition contained within the agreement.
The December 16, 1978, agreement was between decedent and three of his sisters. As individual owners of separate parcels of property in "Sections 43, 52, 53, 27, & 28, T2SR5E, Parish of St. Helena," they agreed "to share equally in any and all proceeds resulting from the production of oil, gas, and other minerals on, in or under any of the respective parcels," until December 1, 1988. If anyone sold his or her property, the agreement would terminate as far as that party was concerned.
This agreement, which pre-dated the December 2,1981, mineral lease, was variously described as a pooling agreement, a partnership, as containing a purely potestative agreement, or analogized to a mineral royalty sale.

A. Nature of Agreement
The agreement cannot be a pooling agreement. Although landowners may agree to pool their interests under certain conditions for production or drilling of oil and gas for specific geographical areas or in different pools at different depths, this agreement attempts none of that, only the sharing of mineral proceeds. LSA-R.S. 30:9. A mineral royalty deed can be analogized to this agreement only in a limited way. A royalty is the right to share in gross production free of drilling or production costs, but a mineral royalty deed refers to a negotiated agreement resulting in execution of a mineral lease. LSA-R.S. 31:80, 213.
Neither is this agreement rendered null by the presence of a purely potestative condition, defined as the exclusive right to control events by one of the contracting parties. LSA-C.C. art. 2024.[6]
The agreement contains both a resolutory and suspensive condition. An agreement with a resolutory condition takes effect immediately, but may be defeated if an event (property sale) occurs. The Civil Code permits limited exceptions similar to this case. For example, a sale may be conditioned on the vendor's future decision to redeem the property. The sharing agreement is reciprocal, with no party to the agreement able to do more than terminate his or her own interest. A suspensive condition depends upon the execution of a future, uncertain event (drilling and production), with the agreement not executed until after the occurrence of the event. None of the individuals signing the agreement was able to drill for minerals on his own, but reasonably expected to enter into a lease for that purpose. LSA-C.C. arts. 2021,[7] 2036,[8] 2043.[9]Humble Oil & Refining Company, 159 So.2d at 136.
Whether the agreement is considered a joint venture or a partnership, either would be treated the same under the law. In 1981, the law was changed to require that a written contract for joint exploration, development, or operation of mineral rights expressly created a partnership. LSA-R.S. 31:215. But prior to that legislative change, partnership law required *156 intent to form a partnership, which was created by contract to combine efforts or resources to collaborate at mutual risk for common profit or benefit. Under the law in effect at the time the agreement was confected, if not stated in the agreement, participation in profits presumed mutual sharing of losses as regulated by law. Also, a partnership was terminated with the death of one of the partners. LSA-C.C. arts. 2801, 2803, 2811;[10]Buckbee, Individually and as Administratrix of Succession of Buckbee v. Aweco, Inc., 418 So.2d 698 (La.App. 3rd Cir.1982), writ denied, 422 So.2d 166 (La.1982).
According to the executor's trial testimony, it was the decedent's intent, when he suggested the sharing plan to his siblings, simply to share equally in the mineral proceeds, not to form a partnership. The executor had handled decedent's legal affairs over a period of years and knew him well. The role of the trier of fact is to evaluate credibility of witnesses and the appellate court should not disturb this factual finding in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
We are unable to determine the exact nature of this agreement. Both the Civil Code and Mineral Code permit freedom of contract among parties. All things not forbidden by law may legally become the subject of a contract, with courts bound to give legal effect to them according to the true intent of the parties. When in doubt, the agreement may be explained by reference to other contracts on the same subject between the same parties, either before or after this one, with preference for the interpretation which gives the agreement effect. LSA-C.C. arts. 1764, 1945, 1949, 1951, 2037;[11] LSA-R.S. 31:2 and 3.

B. Validity of Agreement
Appellant attacked the validity of the sharing agreement on several grounds: that the land was not specifically described, that separately owned tracts were subjected to the pooling agreement, and that equal sharing was an unfair division since decedent had the larger tract. The identity of the property is the most complicated of the three issues. The sharing agreement referred to Exhibits A and B, which were supposed to show each separate parcel of land owned by the family members who signed the agreement. These exhibits, originally missing, were found to have been indexed August 26, 1983 and bore no reference to the agreement. The executor testified that these were the same maps he had prepared to go with the agreement and that he had given them to decedent to file. There is no evidence that the exhibits had not been filed with the original instrument and separately stored with other maps for convenience or according to local custom.
Appellant argues that parol evidence may not be used to supply the missing identification since parol evidence may not be used to establish title to immovable property. By codal definition, a mineral right is an incorporeal immovable, subject to codal articles respecting immovable property. All transfers of immovable property must be in writing and parol evidence is not admissible to vary, alter or contradict the written terms of a contract. LSA-R.S. 31:18; LSA-C.C. arts. 2275, 2276.[12] While there are exceptions to the parol evidence rule, they are not applicable in this case, since the language in the written agreement is clear and the parol evidence is not being used to vary the agreement, but to further substantiate it. The agreement describes *157 the land owned by the parties by township, range and section and covers all the property owned in St. Helena Parish by the parties. Therefore, the exhibits are not offered to vary the contract or to establish title, but to provide a more precise property description. Meeks v. Romen Petroleum, Inc., 452 So.2d 1191, 1194 (La.App. 1st Cir. 1984), writ denied, 457 So.2d 13 (La.1984). We find no manifest error in the trial judge's holding that there was no dispute about the identification of the property covered in the agreement.
Arguments about the remaining issues concerning the agreement are also without merit. The parties to the agreement had broad freedom to contract concerning their separately owned parcels of land and even if equal sharing was an unfair division of profits from unequally owned property, decedent, the largest landowner, was the party who proposed it. The trial court accurately described this agreement as a "family situation," with decedent wanting to keep the mineral proceeds on family land within the family. Its ruling that the agreement was heritable is founded on the legal presumption that every obligation is deemed heritable as to the parties unless proved otherwise. LSA-C.C. 1999.[13] Thus, the sharing agreement affects "all proceeds resulting from the production of oil, gas and other minerals on, in or under any of the respective parcels," which would include the mineral proceeds (fruits) which were paid during the existence of the community, the delay rentals paid after the community terminated and any proceeds from wells under production at the creation of the usufruct until the agreement terminates on December 1, 1988. LSA-R.S. 31:190; Alexander v. Alexander, 357 So.2d 1260,1263 (La.App. 2nd Cir.1978).
For the foregoing reasons, the trial court's decision is affirmed. Costs are taxed to appellant.
AFFIRMED.
NOTES
[1] The community right to reimbursement for community funds used to enhance decedent's separate property was recognized.
[2] Now LSA-C.C art. 1770.
[3] Repealed by 1984 La.Acts, No. 331, § 1.
[4] LSA-C.C art. 2342 amended by 1982 La.Acts, No. 453, § 1.
[5] Appellant's attorneys checked out the evidence files from the Court of Appeal on July 18, 1984. The evidence was never returned and counsel indicated to the Clerk of Court that they did not have it. So, much of the evidence bearing on this issue was not available to us.
[6] Now LSA-C.C. art. 1770.
[7] Now LSA-C.C. art. 1767.
[8] Repealed by 1984 La.Acts, No. 331, § 1.
[9] Now LSA-C.C. art. 1767.
[10] LSA-C.C arts. 2801, 2803 and 2811 amended by 1980 La.Acts, No. 150, § 1.
[11] LSA-C.C art. 1764 amended by 1984 La.Acts, No. 331, § 1; now LSA-C.C. art. 1971. LSA-C.C. art. 1945 repealed by 1984 La.Acts, No. 331, § 1; see LSA-C.C. arts. 2045, et seq. LSA-C.C. art. 1945 amended by 1984 La.Acts No. 331, § 1; now LSA-C.C. art. 2053. LSA-C.C. art. 1951 amended by 1984 La.Acts, No. 331, § 1; now LSA-C.C. art. 2049. LSA-C.C. art. 2037 repealed by 1984 La. Acts, No. 331, § 1.
[12] LSA-C.C. art. 2275 amended by 1984 La.Acts, No. 331, § 1; now LSA-C.C. arts. 1832 and 1839. LSA-C.C art. 2276 amended by 1984 La.Acts, No. 331, § 1; now LSA-C.C. art. 1848.
[13] Amended by 1984 La.Acts, No. 331, § 1; now LSA-C.C. art. 1765.