840 So.2d 641 (2003)
James H. SCHULTZ
v.
Dr. Richard M. HILL, Barbara Stice Hill, Stice-Hill Town & Country Shopping Center Partnership, Dewanna Atkins, J.L. Mallett, Belleview Shopping Center Partnership, Stice-Hill Edgewood Plaza Partnership, and Tioga Oaks Shopping Center General Partnership.
No. 2002 CA 0835.
Court of Appeal of Louisiana, First Circuit.
February 14, 2003.
Rehearing Denied April 3, 2003.
*642 John Dale Powers, Neil H. Mixon, Baton Rouge, Counsel for Appellant James H. Schultz.
Robert L. Kleinpeter, Baton Rouge, Counsel for Appellee Dr. Richard M. Hill, et al.
Before: FOIL, McCLENDON, and KLINE,[1] JJ.
McCLENDON, J.
This appeal arises from the trial court's dismissal of the majority of an action for real estate commissions against the landlord(s) on numerous leases of immovable property. For the reasons that follow, we reverse and remand.

FACTS AND PROCEDURAL HISTORY
Beginning in the early 1970's and continuing through April 1994, the plaintiff, James H. Schultz, a licensed real estate agent and broker, established and maintained a business relationship with Dr. Richard M. Hill in which Mr. Schultz assisted Dr. Hill in the acquiring, developing, and leasing of various shopping center interests throughout Louisiana. Dr. Hill, individually and as managing partner for the partnerships owning the various shopping centers, and Mr. Schultz formalized their agreement for compensation to Mr. Schultz by virtue of numerous commission agreements, combined with attached and/or referenced lease agreements, in which Dr. Hill agreed to pay Mr. Schultz a percentage[2] of the lease revenues from various shopping center tenants who had been procured by Mr. Schultz.
Following the 1994 formal termination of Mr. Schultz's employment with Dr. Hill, a dispute arose as to Mr. Schultz's continued right to collect commission on the leases at issue. On October 10, 1997, Dr. Hill's attorney forwarded a letter to Mr. Schultz, stating that notice was being given therein under LSA-C.C. art.2024, terminating any and all commission agreements by and between Dr. Richard M. Hill and James H. Schultz under the following conditions:
1) Dr. Richard M. Hill will continue to pay a commission to James H. *643 Schultz on all rental agreements where a written commission agreement was executed and presently occupied by the tenant on a month-to-month basis for a period of three (3) months commencing November 1, 1997.
2) Dr. Richard M. Hill will continue to pay the commission to James H. Schultz on any commission due on any written lease still in existence for the primary term provided in the written lease and if the written lease is still in existence by virtue of a renewal for a specific lease period not to exceed three (3) years.
Mr. Schultz filed suit on April 8, 1998, seeking to recover alleged accumulated, unpaid commissions and future commissions. A trial on the matter was held on October 24, 2001. Judgment was signed on January 16, 2002, ordering the continued payment of lease commissions and accounting with regard to six tenants, but rejecting all of plaintiff's other demands. From this judgment, Mr. Schultz appealed and on appeal makes the following assignments of error:
(1) The trial court committed legal error in finding and holding that the Lease Commission Agreements sued upon are contracts of unspecified duration that are subject to being terminated at the will of either party pursuant to the provisions of La. Civ.Code Art.2024.
(2) The [trial court] erred in not holding and finding that defendants-appellees breached the Lease Commission Agreements sued upon and in not holding defendants-appell[ees] liable to plaintiff-appellant Schultz for breach of contract damages, and in not holding that defendants-appellees' obligations are continuing and on-going on the "active" and "continuing" Lease Commission Agreements, pursuant to the terms thereof.
(3) The [trial court] erred in not casting defendants-appellees for all costs of court, including expert witness fees of plaintiff-appellant's expert Ben Johnson.

DISCUSSION AND ANALYSIS
The trial court denied the majority of plaintiff's claims based on a finding that the contracts between the parties were of unspecified duration and therefore under LSA-C.C. art.2024 could be terminated upon reasonable notice by either party. Having made a determination that reasonable notice was given by Dr. Hill to Mr. Schultz,[3] the court found that no further commissions were owed, with the exception of six leases wherein Dr. Hill had agreed to continue payment of commissions.[4]
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Evans v. Lungrin, 97-0541, p. 6 (La.2/6/98), 708 So.2d 731, 735; Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, *644 if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Evans v. Lungrin, 97-0541 at pp. 6-7, 708 So.2d at 735, citing Ferrell v. Fireman's Fund Insurance Company, 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541 at p. 7, 708 So.2d at 735; Lasha v. Olin Corporation, 625 So.2d 1002, 1006 (La. 1993); Rosell v. ESCO, 549 So.2d at 844 n. 2. See also Gonzales v. Xerox Corporation, 320 So.2d 163, 165 (La.1975); Ragas v. Argonaut Southwest Insurance Company, 388 So.2d 707, 708 (La.1980).

DURATION OF COMMISSION CONTRACTS
The decision of the trial court is based on its application of LSA-C.C. art. 2024 to the contracts between the parties; article 2024 provides as follows:
A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.
The parties agree that the pertinent language in these commission agreements is the same, and states:
Landlord hereby agrees to pay to JAMES H. SCHULTZ, his heirs, successors or assigns, a real estate commission equal to five (5%) percent of all monies collected during the initial term, options, renewals, extensions, assignments or additional leases with the Tenant. Landlord hereby binds and inures to the benefits of the parties hereto his legal representatives, heirs, successors and assigns to pay said commission. In the event the Landlord sells, assigns or transfers the leased premises during the term of this agreement, then Landlord's obligation to pay commissions shall continue and Landlord further agrees to require any purchaser or future owner of said property to assume the obligation to pay commissions. Said commission to be paid monthly as Landlord receives the payments as required by the lease. [Emphasis added.]
The determinative legal question is whether this contractual language is of "unspecified duration" or had a definite term.
Although LSA-C.C. art.2024 was enacted as a new article by 1984 La. Acts, No. 331, effective January 1, 1985, the comments to that article indicate that it did not change the law. LSA-C.C. art.2024, Comment (a). Further, the comments to Article 2024 indicate that by "unspecified" duration, it is meant "indefinite" duration, when in Comment (c) it is stated, "Under this Article, a contract of employment for an indefinite duration may be terminated at the will of either party."
Since, with respect to the instant contract, the "duration" of the contract is its "term," Article 2024 should be read in pari materiai, pursuant to LSA-C.C. art. 13, with LSA-C.C. art. 1778, which provides:
A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence *645 of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.
Comment (b) to Article 1778 states, "Under this Article, a term may be fixed not only by a period of time allowed for the performance of an obligation but also by an event which is certain, such as a person's death."
In essence, LSA-C.C. art. 1778 describes three different types of scenarios concerning the term of a contract: (1) a certain or fixed term; (2) an uncertain but determinable term; or (3) an uncertain and undeterminable term. Taking the comments and text of Article 1778 together, one concludes that an uncertain term that is determinable by reference to the happening of a future event is valid and enforceable, even though the date of the happening of that future event cannot be known until its occurrence.
We reconcile Article 2024 and 1778 by concluding that Article 2024 can only be applied to contracts of "unspecified duration;" i.e., contracts having an uncertain and undeterminable term. We further conclude that since Article 1778 allows the term of a contract to be fixed with reference to the happening of a future event, that the term or duration is thereby specified and LSA-C.C. art.2024 is inapplicable. In the case currently before us, we find the commission agreements do not contain an uncertain and undeterminable term, but rather an uncertain but determinable term. In these agreements, the term is fixed by the happening of a future event; i.e., the termination of the applicable lease.
Only one case has been cited by the parties that directly addresses the issue presented herein: State ex rel. Guste v. Orkin Exterminating Company, 528 So.2d 198 (La.App. 4 Cir.), writ denied, 533 So.2d 18 (La.1988). In the Orkin case, the contracts at issue were for pest control and repair services with guarantees for the lifetime of the treated structures so long as the customers paid a specified annual renewal fee. There was no provision in the contracts for an increase in the annual renewal fees unless the structures had been altered after treatment. When Orkin began raising the annual renewal fees by forty percent or $25, whichever was greater, legal action was instituted. In ruling that the increased renewal fees constituted a breach of the contracts, the Fourth Circuit found the contracts to be of definite duration, stating:
A contract for the lifetime of the structure is for a definite and ascertainable period. Contractual obligations dependent on an ascertainable fact or event is [sic] sufficient to render the duration of the contract definite and certain. Contracts may be uncertain as to point of time when they will terminate, so long as there is no uncertainty as to the event which will bring about their termination. [Citations omitted.]
State ex rel. Guste v. Orkin Exterminating Company, 528 So.2d at 201.[5]
We construe the contracts at issue in the instant case to have a determinable term because the payment of commission is specified as being due "during the initial term, options, renewals, extensions, assignments or additional leases with the Tenant." *646 It is clear that when the tenancy ends, the contract for the payment of commission ends. Therefore, LSA-C.C. art. 2024 is inapplicable and the trial court committed legal error in finding the defendanty/landlords had the right to terminate the commission contracts upon reasonable notice under the provisions of Article 2024.
We reject defendants' argument that it is inappropriate in the instant case to look beyond the "four corners" of the commission agreement to define the extent of the agreement between the parties. Whereas in the instant case the contract makes specific reference to and incorporates another document, that document becomes part of the contract and as such is within the "four corners" of the contract and not considered extrinsic evidence. We distinguish the cases cited by defendant in this respect, particularly Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741, which dealt with a transaction/compromise agreement and an attempt to vary from the plain language of that document on a claim that the intended scope of the release was less than it appeared from the language therein. In the instant case, as indicated the lease agreements at issue were not extrinsic evidence of a contrary intent of the parties, and were not in fact contradictory, but rather were incorporated by specific language into the main commission agreement, giving only additional details of that agreement.
The holding of this court in Succession of Lindsey, 477 So.2d 148 (La.App. 1 Cir. 1985) lends support to our conclusion herein. In the Lindsey case, at issue was the admissibility of exhibits to a mineral rights revenue sharing agreement. Attached to that agreement were exhibits listing the particular pieces of property owned by the parties and covered by the agreement. In holding these exhibits admissible, we stated:
When in doubt, the agreement may be explained by reference to other contracts on the same subject between the same parties, either before or after this one, with preference for the interpretation which gives the agreement effect....
Appellant argues that parol evidence may not be used to supply the missing identification since parol evidence may not be used to establish title to immovable property. By codal definition, a mineral right is an incorporeal immovable, subject to codal articles respecting immovable property. All transfers of immovable property must be in writing and parol evidence is not admissible to vary, alter or contradict the written terms of a contract. While there are exceptions to the parol evidence rule, they are not applicable in this case, since the language in the written agreement is clear and the parol evidence is not being used to vary the agreement, but to further substantiate it. The agreement describes the land owned by the parties by township, range and section and covers all the property owned in St. Helena Parish by the parties. Therefore, the exhibits are not offered to vary the contract or to establish title, but to provide a more precise property description. We find no manifest error in the trial judge's holding that there was no dispute about the identification of the property covered in the agreement. [Footnotes omitted; citations omitted.]
Succession of Lindsey, 477 So.2d at 156-57.
Since the incorrect application of law in this case caused the trial court to pretermit an examination of the lease commission agreements and reach a determination as to which tenancies continued past *647 the last date commission was paid and as to what amount was due plaintiff therefor, we turn now to a de novo examination of the evidence presented at trial.

TERMINATION OF TENANCIES
In order to ascertain when a particular tenancy terminated and thereby ended the right of plaintiff to collect commission on rental payments of the premises leased, the provisions of the commission agreements must be examined. At the outset, we note that while the commission agreements particularly named the payee of commission as "JAMES H. SCHULTZ, his heirs, successors or assigns," the terms "Landlord" and "Tenant" were not otherwise defined. However, each commission agreement referenced a lease agreement by naming the purported tenant and a brief description of the leased premises. The name of the "Landlord" was not specifically disclosed though each agreement is signed at the bottom as follows: "By: [signature of Richard M. Hill] (Landlord)." The capacity in which Dr. Hill signed the documents, whether representative or as an individual, was further not disclosed. Since the lease agreements were incorporated by reference into the commission agreements, the two must be read together and the lease agreements serve to fill the gaps in the commission agreements with respect to identity of the landlord, tenant, premises leased, and duration of the lease.
The identity of the tenant, in some of the leases under consideration, is an issue in this case since the juridical identity of the tenant changed and new leases were signed to that effect. Because the commission agreement(s) obligate(s) the landlord of the referenced lease only with respect to the particular tenant named therein, we reject plaintiff's claim to receive commission payments where the juridical identity of the tenant changed in subsequent leases. Had the parties desired to make the commission payments extend to successors of the tenant, then the lease could have so specified as easily as it was specified that the commission payments would be made to the "heirs, successor or assigns" of Mr. Schultz or by the "legal representatives, heirs, successors and assigns" of the landlord.
We further reject any claim by plaintiff that the commission agreements apply to subsequent leases of other premises/locations, though between the same landlord and tenant. The commission agreements reference payment of commission for the "leased premises" and specifically provide for compliance with the commission agreement by any subsequent owners of the "leased premises." Although the agreement provides for payment of commission on "additional leases with the Tenant," the clear meaning of that provision applies with respect only to the "leased premises;" i.e., the physical location named in the lease agreement. The words of a contract must be given their generally prevailing meaning. LSA-C.C. art. If the parties had contemplated that commission payments would extend to any other premises owned by the landlord and subsequently leased to the tenant, the agreement could have so stated.
Also in dispute in this proceeding is Mr. Schultz's claim that he is entitled to collect commission on rental payments due under the terms of a lease, that were voluntarily abated, waived, or for which no collection efforts were made.[6] We find the *648 language of the commission agreements dispositive of this issue, as it was stated that Mr. Schultz was to receive a percentage of "all monies collected" from the tenant. (Emphasis added.) Since the rental amounts that were "abated" were not collected from the tenant and the tenant was in effect excused from paying the rent due during the abatement period, Mr. Schultz was not contractually entitled to collect a percentage of money not collected. The testimony of Mr. Schultz that Dr. Hill had actually paid him a commission on abated rent in the past cannot serve to extend the written agreement of the parties.
We will examine each claim for commission for each particular lease, in turn, grouped under the following categories: (1) Ongoing/Unchanged Leases; (2) Ongoing/Unchanged Leases with Abated Rent; (3) Unchanged Leases Subsequently Terminated with Abated Rent; (4) Leases with Subsequently Altered Tenant or Premises; and (5) Ongoing Leases with No Claim for Future Commission.[7]
Ongoing/Unchanged Leases
With respect to the following lessees, there was at the time of the trial of this matter, no change in the status of the original lease agreements upon which Mr. Schultz was entitled to collect commissions under the contracts he had with the landlord in question: Jules Madere Creative Jewelers, Inc. (A-07);[8] Cindy Lee Waters (A-14);[9] Shelton S. and Loretta S. Watts (A-33);[10] Michael T. Abadie (A-35);[11] Robert E. and Virginian P. Sinclair (A-50);[12] Sammy Joseph Parrino (A-53);[13] and Huey and Chongsuk Toups (A-55).[14] For these leases, the tenant and leased premises remained the same. Therefore, plaintiff is entitled to recover the percentage commission as provided in the pertinent commission agreement on the monies collected from these tenants from the time such commission payments were discontinued *649 through the time of trial and there after until such time as either the tenant or leased premises change.
Nevertheless, we found upon inspection of plaintiff's exhibits tallying the amount owed under these and the other leases listed hereinbelow that legal interest was calculated in violation of LSA-C.C. arts. 2000 and 2001, in that interest on accrued interest was added into the calculation of the amount due. Therefore, we will remand this matter to the trial court for a determination of the exact amount owed on each of these leases with interest to be determined only on each sum that became due from the date that it was due, and with the direction that interest not be calculated and included on accrued interest. See Chittenden v. State Farm Mutual Automobile Insurance Company, XXXX-XXXX, pp. 15-17 (La.5/15/01), 788 So.2d 1140, 1151-52.
Ongoing/Unchanged Leases with Abated Rent
As to the lease involving tenants, Francis Ralston McLavy, Jr., Monita Gayle Jackson McLavy, Edward Young Easterly, Jr., and Katherine Louise Kuntz Easterly, doing business as McLavy & Easterly (A-08), the testimony revealed that one or more of the originally named tenants may have sold out his interest in the business in question; however, at least one of the original tenants continues the lease. It was further admitted at trial that some $17,000 in rent payments were abated by the landlord in exchange for the tenant making improvements to the leased premises. As previously indicated, we reject plaintiff's claim to commission on abated rent. However, since the lease in all other respects remained unchanged at the time of trial, plaintiff is entitled to recover commission in the percentage as stated in the commission agreement on the amounts collected from this tenant from the time such commission payments were discontinued (January, 2000) through the time of trial and thereafter until such time as either the tenant or leased premises change. On remand, we instruct the trial court to calculate this amount with legal interest in accordance with LSA-C.C. arts.2000 and 2001.
Unchanged Leases Subsequently Terminated with Abated Rent
The record reveals that the following tenants maintained an ongoing lease with the landlord, in the same premises, until the premises were vacated and the payment of rent was discontinued:[15] Yvonne C. Berry (A-01);[16] Anna Davis (A-04);[17] *650 Earl J. Savoie, Margaret Ann Lynch Savoie and Keith G. Morris (A-11);[18] D.J. Shelby, II, Inc d/b/a Books, Etc. (A-12);[19] Michael F. Shortess and Robert J. Shortess (A-13);[20] Frank J. Johnson;[21] Robert Wade Minarik and Laurie Powell Minarik (A-42);[22] Thomas D. Lively and Beverly L. Lively (A-58);[23] and, BVM, Inc. (A-61).[24] On these leases, plaintiff is entitled to recover the percentage commission as provided in the pertinent lease commission agreement on the monies collected from these tenants from the time such commission payments were discontinued through the time the leased premises were vacated, but not including any abated or uncollected rent.
Leases with Subsequently Altered Tenant or Premises
In each of the following leases, subsequent to the original lease between the landlord and tenant either the original tenant or premises were changed with a new lease having been executed to that effect: George Leon Collier & Jeannette G. Collier (A-02);[25] Wine & Cheese Shop of Baton Rouge, Inc. (A-03);[26] Robert *651 Quaid, Nona Robillard, and Alex Dugas (A-05);[27] Premier Paging, Inc. (A-06);[28] Miller-Norfolk, Inc. d/b/a Four Seasons Travel Services/Norfolk Tours (A-09);[29] Classic Jewelers, Inc. (A-10);[30] Don Inzenga and Steven Inzenga (A-32);[31] James M. and Carol Guerin (A-37);[32] Jerome Quarterman (A-41);[33] Michael W. *652 and Kathleen C. Simpson, and Charles W. and Judy L. McDonald (A-43);[34] Michael J. and Cynthia F. Nicaud (A-44);[35] and, Tuesday Morning, Inc. (A-45).[36] We conclude, with respect to these leases, that plaintiff is entitled to commission only until a new lease became effective, changing the tenant or the leased premises.
Ongoing Leases with No Claim for Future Commission
With respect to the leases to Winn-Dixie of Louisiana, Inc. and Volume Shoe Corporation, although both these leases appear to be ongoing, based on the evidence presented to the trial court, plaintiff sought recovery of commissions of only $150.34 and $31.50 on these leases, respectively. No evidence was presented to overcome this claim; therefore, these amounts should have been awarded.
Remand for Calculation of Amount Due
Having found that plaintiff incorrectly calculated amounts due under the leases in question, particularly in that interest was added onto accrued interest, we find that justice would best be served by remanding the matter for a determination by the trial court of the exact sums due for commissions found to be owing, as stated herein. On the commissions found due and owing, interest should only be calculated on the amount owed from the date it was due and not on accrued interest, as set forth in LSA-C.C. arts.2000 and 2001. On remand, the trial court is directed to determine the amount owed on these leases in accordance with the foregoing.

COURT COSTS AND EXPERT WITNESS FEES
Since the trial court made no award in plaintiff's favor, no award was made for court costs and expert witness fees. In plaintiff's final assignment of error, he argues that the trial court erred in failing to assess court costs and expert witness fees to defendants. Having found herein that plaintiff's claim has merit in part, we also find it appropriate that the landlord/defendants, cast in judgment, also be cast for costs and plaintiff's expert witness fees in accordance with LSA-C.C.P. art.1920. Upon remand, the trial court is directed to determine the amount owed by each respective landlord/defendant and apportion costs correspondingly.

*653 CONCLUSION
For the reasons assigned herein, the judgment of the trial court dismissing the suit of plaintiff, James H. Schultz, is hereby reversed, and the matter is remanded to the trial court for a determination of the exact amounts due from the respective defendants, applying legal interest and apportioning costs in accordance with the foregoing. All costs of this appeal are to be borne by defendants herein.
REVERSED AND REMANDED.
NOTES
[1] Hon. William F. Kline Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although in most of the commission agreements at issue the stated commission rate was five percent, there were a few in which the commission rate was two and one-half percent, one at three percent, and another one at six percent.
[3] The issue of notice was never in dispute, as Dr. Hill, through counsel, had written a letter attempting to terminate the commission agreements.
[4] These six leases were listed by the trial court as: A-15 TCBYHeflin/Webbto Smith, et al.Youngd/b/a TCBY; A-36 Wyman & Martha Dunlap d/b/a Chef Products, Inc.; A-40 Kean's the Cleaner, Inc. (Town & Country Shopping Center); A-63 Dollar GeneralEdgewood Plaza Shopping Center; A-64 Radio ShackEdgewood Plaza Shopping Center; and A-67 Dollar GeneralTioga Oaks Shopping Center.
[5] The Orkin court distinguished the cases of Baynard v. Guardian Life Insurance Company of America, 399 So.2d 1200 (La.App. 1 Cir. 1981) and Jones v. Crescent City Health and Racquetball Club, 489 So.2d 381 (La.App. 5 Cir.1986), which dealt with lifetime contracts of employment and lifetime health club memberships, respectively, because the invalidity of lifetime contracts in those particular instances has been legislatively provided for by LSA-C.C. art. 2746 and LSA-R.S. 51:1578.
[6] In some instances, the tenant failed to pay the rent due while continuing to occupy the leased premises or after the premises were vacated and the lease term had not expired. In other instances, the tenant was allowed to forgo making lease payments, for a time, in exchange for making improvements to the leased premises. In these instances, no rent was collected by the landlord though rent would otherwise have been owed.
[7] In so doing, we list each lease by the name of the tenant as given in the original lease agreement, filed into evidence with the trial court, and in parenthesis indicate the letter and number designation for each of these leases as used by plaintiff in his exhibits showing the amount of commissions he claimed were owed.
[8] Plaintiff claimed that commissions remained unpaid and due on this lease from February, 1998 and thereafter.
[9] Plaintiff claimed that commissions remained unpaid and due on this lease from August, 1999 and thereafter.
[10] Plaintiff claimed that commissions remained unpaid and due on this lease from August, 1999 and thereafter.
[11] Plaintiff claimed that commissions remained unpaid and due on this lease from February, 1998 and thereafter.
[12] Plaintiff claimed that commissions remained unpaid and due on this lease from February, 1998 and thereafter.
[13] Plaintiff claimed that commissions remained unpaid and due on this lease from August, 1999 and thereafter.
[14] In the original lease, the landlord was named as "Bellview Shopping Center Partnership;" however, in May of 2001, a new lease was signed changing the name of the landlord to "Stice-Hill Belleview Plaza Partnership." Plaintiff claimed commissions remained unpaid and due for the month of August, 1999 and thereafter. Although the name of the landlord was changed in May of 2001, as a successor to the originally named landlord, the obligation to pay Mr. Schultz's commission continued under the terms of the commission agreement. Thus, plaintiff should recover commissions for the months of August, 1999 and thereafter.
[15] Additionally, a few of these tenants failed to pay rent during their occupancy of the leased premises, for which no commission is due plaintiff.
[16] Plaintiff claimed that commissions remained unpaid and due from February, 1998 and thereafter. Since the tenant vacated the premises in April of 2001, commissions were only due plaintiff between February, 1998 and March, 2001.
[17] Although there was some general testimony at trial that this tenant passed away during the term of her lease and that her heirs assumed responsibility for the lease; there was no evidence that the actual tenant was changed by the signing of a new lease. As plaintiff's lease commission agreement encompassed lease assignments, a commission was due him on this lease even though it may have been assigned. Plaintiff claimed that although he was paid some commission in August, 1999, it was only on the rental amount collected and on a $2,000.00 percentage payment collected; however, plaintiff claims that the amount of percentage payment actually collected was $2,500.00 and that for this month, he is owed commission on the difference of $500.00. We have examined the records and defendants' ledger for that month does in fact show the tenant paid the amounts of $1,116.38 and $2,500.00, while defendants' commission report shows that plaintiff was paid commission only on the amounts of $1,116.38 and $2,000.00. Plaintiff is therefore entitled to collect commission on the $500.00 difference. Additionally, plaintiff claimed that he was not paid commission for amounts collected from January, 2000 through August, 2000, or for amounts abated in May of 2000 and after the premises were vacated in September of 2000. As indicated herein, we do not find plaintiff to be entitled to collect commission payments on abated rent; however, he is entitled to commission on the amounts collected from the tenants between January, 2000 and August, 2000.
[18] Plaintiff claimed that commissions remained unpaid and due from February, 1998 and thereafter. Since the tenant vacated the premises in November, 2000, commissions were only due plaintiff between February, 1998 and October, 2000.
[19] Plaintiff claimed that commissions remained unpaid and due from January, 1998 and thereafter. Since the tenant vacated the premises in June, 1998, commissions were only due plaintiff between January, 1998 and May, 1998.
[20] Plaintiff claimed that commissions remained unpaid and due from January, 2000 and thereafter. Since rent was abated for the months of September, 2000 through December, 2000, and in part for January, 2001 and thereafter until the premises were vacated in April of 2001, commissions were due only on the monies collected from the tenant between January, 2000 and August, 2000 and during the month of January, 2001.
[21] Plaintiff claimed that commissions remained unpaid and due from February, 1998 and thereafter. Since the tenant vacated the premises in August of 2001, commissions were only due plaintiff between February, 1998 and July, 2001.
[22] Plaintiff claimed that commissions remained unpaid and due from February, 1998 and thereafter. Since the tenant vacated the premises in June of 1998, commissions were only due plaintiff between February, 1998 and May, 1998.
[23] Plaintiff claimed that commissions remained unpaid and due from December, 1994 and thereafter. Since no monies were collected from the tenants after June, 1995, commissions were only due plaintiff between December, 1994 and June, 1995.
[24] Plaintiff claimed that commissions remained unpaid and due for January, 1995. Since the neither the tenant nor the leased premises had changed and no monies were collected from the tenants after January, 1995, plaintiff is entitled to a commission on the amount paid in January, 1995.
[25] A new lease became effective on October 1, 1998 changing the tenant from the Colliers to Alicia Beckcom Paxton. Plaintiff claimed commissions remained unpaid and due for the month of April, 1998 and thereafter. Thus, plaintiff is entitled to commission only during the months of April, May, June, July, August, and September of 1998.
[26] A new lease became effective on June 1, 1998 changing the tenant from the Wine & Cheese Shop of Baton Rouge, Inc. to Charles R. Lalonde. Plaintiff claimed commissions remained unpaid and due for the month of November, 1998 and thereafter. Since the tenant changed prior to that time, plaintiff is entitled to no further commission on this lease.
[27] A new lease became effective on March 1, 1997 changing the tenants from the individuals, Quaid, Robillard, and Dugas, to Alex Dugas, Inc. Plaintiff claimed commissions remained unpaid and due for the month of March, 1997 and thereafter. Since the tenant changed beginning in that month, plaintiff is entitled to no further commission on this lease.
[28] Plaintiff claimed commissions remained unpaid and due from February, 1998 and thereafter. We note that this tenant originally executed two leases to occupy two shops in Bocage Village Shopping Center, one with a physical address on Jefferson Highway and the other with a physical address on Old Hammond Highway. The Old Hammond Highway location was vacated in December, 1998, while the Jefferson Highway space continued to be occupied at the time of trial. However, in April of 1998, a new lease was effected changing the tenant from Premier Paging, Inc. to Satellink Paging, L.L.C. While there was some evidence submitted that there was a merger between the two companies as well as other companies, it was insufficient to disprove that as of April, 1998, a new juridical entity had become the tenant of the leased premises at issue. Thus, on both leases, plaintiff is only entitled to collect commissions on monies collected in February and March of 1998.
[29] A new lease became effective on April 25, 1997 changing the tenant from Miller-Norfolk, Inc. d/b/a Four Seasons Travel Services/Norfolk Tours to Merrill Holdings, L.L.C. Plaintiff claimed commissions remained unpaid and due for the month of May, 1997 and thereafter. Since the tenant changed prior to that time, plaintiff is entitled to no further commission on this lease. We note that prior to the signing of the lease by Merrill Holdings, L.L.C., the original lease was assigned to them; however, plaintiff does not assert he did not receive his commission during the assignment period.
[30] The original lease signed by these tenants was for the premises located at 7610 Old Hammond Highway; however, in August of 1995, a new lease was executed changing the leased premises to 7643 Jefferson Highway. Although plaintiff continued to receive commission payments through December of 1999, they were not due under the terms of the lease commission agreement after August of 1995. Thus, plaintiff is not entitled to any further commission on this lease.
[31] A new lease became effective on September 1, 1994 changing the tenant from Don Inzenga and Steven Inzenga to S & J Corporation. Plaintiff claimed commissions remained unpaid and due for the month of October, 2000 and thereafter. Since the tenant changed prior to that time, plaintiff is entitled to no further commission on this lease.
[32] A new lease became effective on October 1, 1998 changing the tenant from the Guerins to JJL, L.L.C. Plaintiff claimed commissions remained unpaid and due for the month of February, 1998 and thereafter. Thus, plaintiff is entitled to commissions only during the months of February through September of 1998.
[33] A new lease became effective on July 1, 1998 changing the tenant from Mr. Quarterman to Jiangdi Fan and Kaiyuan Yu. Plaintiff claimed commissions remained unpaid and due for the month of February, 1998 and thereafter. Thus, plaintiff is entitled to commissions only during the months of February through June of 1998. We note that prior to the signing of the lease by Jiangdi Fan and Kaiyuan Yu, the original lease was assigned to them in 1989; however, since plaintiff's lease commission agreement encompassed lease assignments, commissions were due him on this lease during the assignment period.
[34] A new lease became effective in August of 1999 changing the Simpson/McDonald tenants to Landshark, Inc. Plaintiff claimed commissions remained unpaid and due for the month of February, 1998 and thereafter. Thus, plaintiff is entitled to commissions only during the months of February, 1998 through July of 1999. We note that prior to the signing of the lease by Landshark, Inc., the original lease was assigned to Leonard and Kimberly Pitre in 1993; however, since plaintiff's lease commission agreement encompassed lease assignments, commissions were due him on this lease during the assignment period.
[35] A new lease became effective on June 1, 1994 changing the tenant from the Nicauds to Jacqueline Doran, Janet Pendergast, and John Pendergast. Plaintiff claimed commissions remained unpaid and due for the month of June, 1994 and thereafter. Since the tenant changed beginning in that month, plaintiff is entitled to no further commission on this lease. We note that prior to the signing of the lease by Ms. Doran and the Pendergasts, the original lease was assigned to them, along with George Doran in 1993; however, plaintiff does not assert that he failed to receive commissions during the assignment period.
[36] In the original lease, the tenant leased the premises located at 12688 Perkins Road. Effective May 1, 1998, the location of the leased premises was changed to 12674 Perkins Road. When the leased premises changed, plaintiff was no longer entitled to a commission under his agreement with the landlord, and since plaintiff did not claim the landlord had failed to pay any commissions prior to May 1, 1998, plaintiff is not entitled to any further commission on this lease.