STEWART, J.
 

 | iThis is a contract dispute between Regency Intrastate Gas, L.L.C., (hereafter “Regency”), and Caddo Gas Gathering, L.L.C., (hereafter “Caddo Gas”), involving an agreement for the transportation of natural gas through a pipeline owned by Regency. The trial court rendered a summary judgment dismissing Regency’s re-conventional demand for a judgment declaring the term provision of the gas transportation agreement to be of indefinite duration subject to termination by either party upon reasonable notice in accordance with La. C.C. art. 2024. Because we find that La. C.C. art. 2024 does not apply to the term provision and for reasons otherwise explained in this opinion, we affirm.
 

 FACTS
 

 Caddo Gas and Regency are the successors to the original parties of the agreement that is the subject of this dispute. Caddo Gas’s predecessor, Shreveport Intrastate Gas Transmission, Ltd., (“SIG”), was the lessee of a pipeline know as the “Elm Grove Pipeline System,” which was owned by the lessor, Southwestern Electric Power Company (“SWEPCO”). By letter agreement dated April 15, 1988, SIG sold and assigned the “Pipeline Lease with Option to Purchase” (hereafter the “pipeline lease”), to Gulf States Gas Corporation (“Gulf States”), Regency’s predecessor. The price of the sale and assignment was one million dollars ($1,000,000.00). The agreement further provided, “As additional consideration, Seller [SIG] shall reserve for itself, its affiliates, its successors and assigns, the right to transport gas through the Elm Grove System” under specified terms and conditions. | ^Specifically, SIG reserved the right to transport up to 15,-000 MMbtu per day at a rate of five cents per MMbtu.
 
 [1]
 

 The reservation of gas transport rights by SIG was memorialized in a “Gas Transportation Agreement” (hereafter the “transportation agreement”), with Gulf States dated June 1,1988. Of relevance to this dispute is the following provision:
 

 6.
 
 TERM.
 
 Subject to the other provisions of the Agreement and the Standard Terms and Conditions, this Agreement shall remain in force and effect from the date hereof for a term coextensive with the ownership or use of the Elm Grove System by Transporter or its successors or assigns.
 

 The transportation agreement was partly amended in August 1995, by three letter agreements between successors to the
 
 *235
 
 original parties. The letter agreements resolved a dispute about the gas delivery-pressure for the pipeline system but made no change to the term specified in the 1988 transportation agreement.
 

 At present, Regency is the owner of the pipeline system and is obligated, as provided in the above described agreements from 1988 and 1995, to transport natural gas supplied by Caddo Gas. The instant suit was filed by Caddo Gas on July 14, 2006, after Regency refused a request to provide transportation from a specific receipt point on the grounds that the receipt point was not included in the above agreements. Regency reconvened to request a declaratory judgment interpreting the term provision of the transportation agreement. Regency’s reconventional demand asserted that the term stated in the transportation agreement is of ^unspecified duration and that it may be terminated by either party upon reasonable notice as provided by La. C.C. art. 2024.
 

 The parties filed cross motions for summary judgment on the interpretation of the term provision. While Regency argued that the term of the transportation agreement was of unspecified duration, Caddo Gas argued that the transportation agreement was subject to a resolutory condition based on a definite and ascertainable event, namely, the cessation of ownership or use of the pipeline by Regency. After the parties fully expressed their competing positions in volleying memoran-da, the trial court heard arguments and granted summary judgment in favor of Caddo Gas dismissing Regency’s reconven-tional demand. The trial court found La. C.C. art. 2024 inapplicable. Rather, the trial court determined that Regency was bound by an obligation to do under the transportation agreement. While the term of the obligation was not fixed, it was determinable by the occurrence of a future and certain event identified as the point when the pipeline will cease to be used. The trial court found this to be a resoluto-ry condition subject to Regency’s control and exercise of good faith. Regency’s appeal followed.
 

 DISCUSSION
 

 The interpretation of a contract, which typically presents a question of law, is a matter appropriate for summary judgment.
 
 Will-Drill Resources, Inc. v. Huggs Inc.,
 
 32,179 (La.App.2d Cir.8/18/99), 738 So.2d 1196,
 
 writ denied,
 
 99-2957 (La.12/17/99), 751 So.2d 885;
 
 Total Minatome Corp. v. Union Texas Products, Corp.,
 
 33,433 (La.App.2d Cir.8/23/00), 766 So.2d 685.
 

 The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by law. La. C.C.P. art. 966(A)(2). Summary judgments are subject to a
 
 de novo
 
 review on appeal with the court applying the same criteria as the trial court when determining whether summary judgment is appropriate.
 
 Total Minatome, supra.
 
 A motion for summary judgment is properly granted when the pleadings, answers to interrogatories, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
 

 The interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear, explicit, and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. Words used in a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Each provision of a con
 
 *236
 
 tract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. Although a contract may be worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include. La. C.C. art. 2051.
 

 The transportation agreement provision at issue states:
 

 6.
 
 TERM.
 
 Subject to the other provisions of the Agreement and the Standard Terms and Conditions, this Agreement shall remain in |5force and effect from the date hereof for a term coextensive with the ownership or use of the Elm Grove System by Transporter or its successors or assigns.
 

 While the term language appears clear and unambiguous, the parties disagree as to its interpretation. Regency interprets the term provision as one of unspecified duration that is neither certain, fixed, nor determinable. Because the term is tied to
 
 ownership or me
 
 of the pipeline system by the transporter, its successors or assigns, Regency asserts that the term contemplates a perpetual existence and that the obligation to transport would continue even after it, its successors or assigns cease use of the pipeline. On the other hand, Caddo Gas maintains that the term is tied to a determinable future event and that the gas transportation agreement contemplates an operating pipeline system. According to Caddo Gas, when Regency, its successors or assigns no longer operate the system, then the obligation to transport gas ends.
 

 The question presented by Regency’s appeal is whether the term of the gas transportation agreement is of unspecified duration. La. C.C. art. 2024 states, “A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.” Because duration refers to the term of the contract, Article 2024 should be read
 
 in pan materia
 
 with provisions regarding the term of obligations. La. C.C. art. 13;
 
 Schultz v. Hill,
 
 2002-0835 (La.App. 1st Cir.2/14/03), 840 So.2d 641,
 
 writ denied,
 
 2003-1259 (La.9/5/03), 852 So.2d 1043. The term for the performance of an obligation is explained in La. C.C. art. 1778:
 

 |fiA term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.
 

 As described in Article 1778, a term may be either certain and fixed, uncertain but determinable, or uncertain and undeter-minable. The term of the transportation agreement is not certain and fixed. Thus, we must examine whether the term is either uncertain but determinable or uncertain and undeterminable and whether Article 2024 applies.
 

 In
 
 Schultz, supra,
 
 the court analyzed Article 2024 in reference to Article 1778 and concluded that contracts of unspecified duration are the same as contracts whose terms are uncertain and un-determinable.
 
 Schultz,
 
 2002-0835, p. 6, 840 So.2d at 645. However, contracts whose terms are fixed with reference to the happening of a future event are of specified duration and Article 2024 is inapplicable.
 
 Id.
 
 The
 
 Schultz
 
 comb further explained that
 

 [A]n uncertain term that is determinable by reference to the happening of a future event is valid and enforceable, even though the date of the happening of that
 
 *237
 
 future event cannot be known until its occurrence.
 

 Id.
 

 Applying these principles, the
 
 Schultz
 
 court held that contracts for payment of commissions to a real estate agent based on “monies collected during the initial term, options, renewals, extensions, assignments or additional leases with the Tenant” had a determinable term identified by the court as the termination of the tenancies. Under the commissions contracts |7as interpreted by the appellate court, the obligor, Dr. Hill, was obligated to perform by paying commissions to his real estate agent until the tenancies obtained by the agent terminated. The court concluded that once the tenancy ends, the contract for payment of commissions ends. Even though the end of a tenancy was not certain or fixed, it was an event that would happen some time in the future and was therefore determinable. The contracts were not of unspecified duration, and Article 2024 did not apply.
 

 In
 
 State ex rel. Guste v. Orkin Exterminating Company, Inc.,
 
 528 So.2d 198 (La.App. 4th Cir.1988),
 
 writ denied,
 
 533 So.2d 18 (La.1988),
 
 reconsideration denied,
 
 536 So.2d 1209 (La.1989), the court rejected Orkin’s contention that pest control contracts for the lifetime of the treated structure were of indefinite duration and terminable at the will of either party. Instead, the court reasoned that the lifetime of a structure is a definite and ascertainable period that renders “the duration of the contract definite and certain.”
 
 Id., at
 
 201. The court explained, “Contracts may be uncertain as to point of time when they will terminate, so long as there is no uncertainty as to the event which will bring about their termination.”
 
 Id.
 

 Under the gas transportation agreement, Regency as the transporter is obligated to receive, transport and redeliver a specified quantity of gas from Caddo Gas. This is an obligation to do on the part of Regency. (See La. C.C. art. 1756, performance by the obligor may consist of giving, doing, or not doing something.) The term provision describes the period during which the obligation to transport is to remain in force and effect. The obligation can be performed only so long as gas flows from the wells to the pipeline Rand/or the pipeline remains useable. Applying the same principles utilized in the
 
 Schultz
 
 and
 
 Orkin
 
 cases, we find the term of the gas transportation agreement to be determinable by reference to the happening of a future event.
 

 At first blush Regency’s argument regarding ownership of the pipeline extending indefinitely through successors and assigns appears persuasive, particularly in light of the seemingly clear and unambiguous language of the term provision. However, this interpretation would lead to absurd results. Ownership could potentially exceed the life of the pipeline system. Once the pipeline system is no longer useable, such as through exhaustion of the gas supply, then Regency, its successors, or assigns will either voluntarily or by necessity cease to use the pipeline. It would then be absurd to insist that Regency, its successors, or assigns are still bound by the transportation agreement through ownership of the then useless pipeline system. While it is not certain when the pipeline will cease to be used or when gas will cease to flow from the areas serviced by the pipeline, these events will one day take place. Though the term is uncertain, it is certainly determinable by reference to the happening of future events.
 

 Considering the transportation agreement in the context of the full agreement between the parties’ predecessors, we find that the agreement is subject to a
 
 *238
 
 resolutory condition. An obligation that is subject to a resolutory condition may be immediately enforced but will come to an end when an uncertain event occurs. La. C.C. art. 1767. Conditions may be expressed in a stipulation or implied by the law, the nature of the contract, [¡¡or the intent of the parties. La. C.C. art. 1768. Here, the resolutory condition is implied by the nature of the 1988 agreements and the intent of the parties as is evident from those agreements.
 

 Caddo Gas’s predecessor, SIG, sold and assigned its lease rights to the Elm Grove Pipeline System to Regency’s predecessor, Gulf States, by agreement on April 15, 1988, which states:
 

 As additional consideration, Seller shall reserve for itself, its affiliates, its successors and assigns, the right to transport gas through the Elm Grove System under the following terms and conditions....
 

 This reservation of the right to transport gas through the pipeline system was then more completely set forth in the transportation agreement, which was
 

 entered into in furtherance of contract between the parties dated April 15, 1988 and in the event of any conflict, the April 15, 1988 contract shall control. The April 15, 1988 contract is in eorpo-rated [sic] herein by reference.
 

 Both the April 15, 1988 agreement and the gas transportation agreement specify the maximum amount of gas that SIG could transport, the transport fee, and the receipt point pressure.
 

 SIG’s right to transport gas through the pipeline system was immediately enforceable upon confection of the 1988 agreements. The term specified in the transportation agreement was “coextensive with the ownership or use of the Elm Grove System by Transporter or its successors or assigns.” SIG reserved the right to transport a specified quantity of gas at a set price as “additional consideration” for selling and assigning its pipeline lease rights. This consideration for the sale and assignment of the | ]nlease rights would be meaningless if the right to transport gas through the pipeline system could be terminated by Gulf States, now Regency, upon reasonable notice. Clearly, the reservation of transport rights as additional consideration and the language making the term of the gas transportation agreement coextensive with the ownership or use of the pipeline system indicates the parties’ intent for SIG, now Caddo Gas, to have the right to transport for the life of the system. In selling and assigning its pipeline lease to Gulf States, SIG bargained for the right to continue transporting a set amount of gas at a favorable rate. Implicit in this reservation of the right to transport gas through the pipeline system is the understanding that the agreement would remain in effect as long as the system continues to operate. However, once the gas stops flowing and the system is no longer usable, then the obligation to transport will end.
 

 This interpretation is further supported by the August 1995 letter agreements which reference the transport rights reserved as “additional consideration” in the 1988 pipeline assignment and sale. In exchange for allowing Regency’s predecessor to exceed the agreed upon gas delivery pressure, Caddo Gas’s predecessor negotiated the right to transport from additional receipt points along the pipeline system. The 1995 agreements indicate the continuation of a long-term relationship based on the “additional consideration” for the sale and assignment of the valuable pipeline
 
 *239
 
 rights by Caddo Gas’s predecessor, SIG, to Regency’s predecessor, Gulf States.
 

 |nIn sum, we find no merit to Regency’s argument that the transportation agreement provides for perpetual existence of the parties’ contractual relationship and that it must be considered a contract of unspecified duration subject to termination upon reasonable notice as allowed by La. C.C. art. 2024. Application of the plain language of the term provision, as urged by Regency, would lead to absurd results. Once the gas ceases to flow and the pipeline system is no longer used, the obligation to transport can no longer be performed even if the system is still “owned” by Regency, its successors, or assigns. The obligation is subject to a resolutory condition the occurrence of which will end the agreement.
 

 Although Caddo Gas filed a peremptory exception of res judicata for the first time on appeal, our holding in favor of Caddo Gas renders its exception moot.
 

 CONCLUSION
 

 For the reasons stated, we find that summary judgment in favor of Caddo Gas Gathering, L.L.C., and dismissing the re-conventional demand of Regency Intrastate Gas, L.L.C., was properly granted as a matter of law. Costs of appeal are assessed to plaintiff-in-reconvention, Regency.
 

 AFFIRMED.
 

 [1]
 

 . MMbtu refers to one million British thermal units of natural gas.