*284
 
 LOLLEY, J.
 

 Iiln this breach of contract case, plaintiff RJAM, Inc., appeals the decision of the 42nd Judicial District Court, Parish of De-Soto, State of Louisiana, which found in favor of defendants, Leon Miletello d/b/a L.S.M. Amusement Company, L.S.M. Gaming Inc. and Logansport Gaming, L.L.C. For the following reasons, we reverse and remand.
 

 FACTS
 

 This case concerns a breach of contract claim wherein RJAM, Inc. (“RJAM”) is seeking a percentage of revenue derived from video poker devices pursuant to a “Compensation Agreement.” The Compensation Agreement was created in connection with the acquisition and operation of a truck stop casino in Logansport, Louisiana, known as Golden’s Quickstop (“Golden’s”) which was owned by Larry Golden.
 

 History of the Parties
 

 Raymond Mahfouz worked for Louisiana Gaming Management (“LGM”), a company which was in the business of funding and providing video gaming devices for locations in consideration of a percentage of revenue generated by the devices. On July 3, 1992, Mahfouz contracted with Golden’s for placement of the video poker devices. However, LGM was unable to provide financing and fulfill its part of the contract with Golden’s due mostly to LGM’s inability to get the required gaming licenses. Mahfouz was given permission to seek out investors to fund and acquire LGM’s agreement with Golden’s (“LGM Agreement”). Mahfouz found Sam Mijalis as a willing investor, and Leon Miletello d/b/a LSM Amusement (“LSM Amusement”) to operate the business in aecor-dance |2with LGM’s agreement with Golden’s. The LGM agreement was assigned to LSM Amusement, and it was able to acquire the necessary gaming licenses.
 

 Contracts and Agreements
 

 After the parties were lined up, several contractual transactions occurred setting out the parties’ understanding of the funding and operation of Golden’s. On October 8, 1992, LSM Amusement was assigned LGM’s Agreement and entered into a Location Contract with Golden’s for the exclusive right to place and operate video poker devices on Golden’s property, along with a lease of the property (the “Location Contract”). The term of Location Contract was for 84 months (seven years) beginning October 19, 1992, terminating October 18, 1999, and automatically renewable for 12 months if not cancelled in writing within 30 days prior to the termination date.
 

 In a separate transaction, Mahfouz and Mijalis (“Associates”) entered into a Compensation Agreement with LSM Amusement on October 19,1992 (the “Compensation Agreement”). In consideration for finding Golden’s, LSM Amusement agreed to pay 40% of the adjusted gross income earned monthly by Miletello or $35,000.00 monthly, whichever amount was greater. The contract set out several other provisions regarding priority of payment, and also set forth a payment of $8,400.00 to LSM Amusement as the fee for their operating services.
 

 Mahfouz and Mijalis further agreed among themselves that the revenue received from the Compensation Agreement would be divided 60% |sto Mahfouz and 40% to Mijalis. Mahfouz assigned and transferred 22.5% of his interest to Edgar Mouton. These agreements were also reduced to writing.
 
 [1]
 
 On November 3, 1993,
 
 *285
 
 Mahfouz assigned and transferred all of his rights, title and interest in the Compensation Agreement to RJAM, Inc., plaintiff herein, which is owned by his wife.
 

 Business Operation
 

 Golden’s opened for business in November 1992 and it was owned by Golden and operated by LSM Amusement pursuant to the Location Contract. Miletello paid the Associates per the Compensation Agreement; however, due to modifications by the parties and the varying revenue totals, the actual amount paid differed month to month. As the trial court noted, this modified the “minimum” amount of revenue stated in the contract.
 
 [2]
 

 On March 3, 1998, prior to the expiration of the Location Contract, Larry Golden sold his interest in the property and operation to Logansport Gaming, LLC (“Logansport Gaming”) which is also owned by Miletello. Also, Golden sold by Warranty Deed two parcels of land, the real property upon which Golden’s is located, together with all improvements to Lo-gansport Gaming. Further, Golden sold to Logansport Gaming by Bill of Sale all furniture, fixtures, equipment, as well as all of the outstanding stock of Golden’s Gaming Corporation, Inc., all licenses and permits and the use of Golden’s Truck Stop.
 

 \ ¿Termination of the Location Contract
 

 By correspondence dated March 13, 1998, Miletello advised Mijalis, Mahfouz, and RJAM that Larry Golden had sold all his rights and interests to Logansport Gaming on March 3, 1998, and that as of the date of the sale, the Location Contract by and between LSM Amusement and Larry Golden was terminated. Miletello further advised them that the last payment made by LSM Amusement to RJAM under the Compensation Agreement was for February, 1998.
 

 Subsequently, a Termination Agreement was entered into by and between: L.S.M. Gaming, Inc. (a Louisiana corporation solely owned by Miletello); Logansport Gaming, L.L.C. (also owned by Miletello); Golden’s Gaming Corporation (previously owned by Larry Golden and acquired by Miletello); and, LSM Amusement. These four parties terminated the LGM Agreement and the Location Contract.
 

 Procedural History
 

 On September 24, 1998, RJAM filed the instant suit. The issues of contract liability and damages were bifurcated. On May 12, 2009, after a trial on only the issue of liability, the trial court denied all of RJAM’s claims. The trial court held that the contracts were valid when created; however, since they were modified by later agreements and understandings between the relevant parties, it rendered the contracts “impossible for the Court to determine the true intent of the parties[.]” The trial court ultimately found that RJAM failed to meet its burden of proving the right to collect from the defendants. RJAM now appeals.
 

 |fiLAW AND DISCUSSION
 

 Standard of Review
 

 On appeal, the reviewing court may not set aside a trial court’s findings in the absence of manifest error or unless they are clearly wrong. However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and the appellate court should conduct its own independent,
 
 de novo
 
 review of the record
 
 *286
 
 before it.
 
 Lam ex rel. Lam v. State Farm, Mut. Auto. Ins. Co.,
 
 2005-1139 (La.11/29/06), 946 So.2d 133.
 

 Here, the trial court ultimately held that the contract was void as a result of the various modifications made over the years. While there is evidence of modifications throughout the time the parties were in a business relationship, it did not render the contract void. A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. The law allows for contractual modifications without giving up a contract’s validity. Therefore, we must conduct a
 
 de novo
 
 review of the contractual liability at issue in this suit.
 

 Since a contract establishes the law between the parties, the purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art. 2045. Ordinarily, the meaning and intent of the parties to a written instrument should be determined within the four corners of the document and its terms should not be explained or contradicted by extrinsic evidence.
 
 Rogers v. Horseshoe Entertainment,
 
 32,800 (La.App.2d Cir.08/01/00), 766 So.2d 595,
 
 writs denied
 
 2000-2894 (La.12/08/00), 776 So.2d 463 and 2000-2905 (La.12/08/00), 776 So.2d 464;
 
 Brown v. Drillers, Inc.,
 
 1993-1019 (La.01/14/94), 630 So.2d 741. When a contract is subject to interpretation from the four corners of the instrument, without the necessity of extrinsic evidence, that interpretation is a matter of law.
 
 Brown v. Drillers, Inc., supra.
 
 When the words
 
 of
 
 a contract are clear and explicit and lead to no absurd consequences, no further interpretation need be made into the parties’ intent. La. C.C. art. 2046;
 
 Magnon v. Collins,
 
 1998-2822 (La.07/07/99), 739 So.2d 191, 197.
 

 At first glance, the parties involved seem so entangled in the various business entities, it is easy to lose focus on the issue at hand. However, after parsing the facts, our determination is limited to whether the termination of the Location Contract also terminated the Compensation Agreement. We find that it did not.
 

 The Location Contract and Compensation Agreement are two independent contracts with different underlying obligations owed to different parties. While the four Miletello businesses may have successfully terminated the Location Contract, there is nothing that allows LSM Amusement to unilaterally terminate the Compensation Agreement with the Associates.
 
 See
 
 La. C.C. art. 2024. In fact, the Compensation Agreement does not allow for unilateral termination for the first seven years, and only at the time of renewal is there an option to terminate the contract. Simply stated, since the record clearly reflects that RJAM did not terminate the Compensation Agreement, LSM Amusement breached the contract by ^prematurely terminating it. As such, RJAM is entitled to payment until October 18,1999.
 
 [3]
 

 In an analogous case,
 
 Schultz v. Hill,
 
 2002-0835 (La.App. 1st Cir.02/14/03), 840 So.2d 641,
 
 writ denied,
 
 2003-1259 (La.09/05/03), 852 So.2d 1043, a real estate agent brought an action against a landlord seeking to recover accumulated unpaid commission and future commissions. The landlord sought to terminate the commission contracts after terminating the real estate agent’s services. The
 
 Schultz
 
 court held that the landlord could not terminate commission contracts at will where the
 
 *287
 
 term was determinable by reference to an applicable lease, even if not explicit.
 

 Here, as in
 
 Schultz,
 
 the Compensation Agreement references the Location Contract to define the “term” of the lease. Specifically the contract states, “Appearers acknowledge that this Agreement is binding upon themselves, their heirs and/or assigns throughout the
 
 entire term of the location contract and any renewal thereof.”
 
 (Emphasis Added.) The reference to the location contract identifies a set, specific period of time. We find that the term is easily ascertained — seven years beginning October 19, 1992. It is also clear that, with the option to renew, the contract term could be longer than seven years— but the obligation to compensate the Associates is not less than seven years.
 

 Furthermore, a plain reading of the contract does not lead one to assume that the Compensation Agreement is conditional
 
 upon
 
 the existence |sof the Location Contract. The third paragraph of the Compensation Agreement clearly states:
 

 That for and in consideration of the Associates assisting in obtaining said location, LSM [Amusement] hereby binds and obligates itself to pay as compensation to Associates forty percent (40%) of the adjusted gross income earned monthly by said devices or $35,000.00 monthly whichever is the greater amount.
 

 The clause explains that the services for which the compensation has been earned have already been rendered, namely the finding of Golden’s. The Compensation Agreement is merely a formula for calculating the compensation between the Associates and Miletello. While Miletello argues that the Compensation Agreement is effective “only for the life of the underlying Location Contract,” the language of the Compensation Agreement does not support this contention. There is nothing in the contract that makes the Compensation Agreement valid only “so long as” the Location Contract is in effect. As stated earlier, it merely identifies the term of the Compensation Agreement.
 

 Miletello also argues that the contract is extinguished because of confusion — where the obligee and obligor are united. Confusion is not applicable in this situation. Again, Miletello may have been able to terminate the Location Contract as owner of the various businesses; however, in the Compensation Agreement the obligees and obligors are different. Finally, in light of our findings we pretermit any discussion of whether RJAM is a third-party beneficiary of the Location Contract.
 

 1
 
 JDamages
 

 Despite our
 
 de novo
 
 review and our finding that LSM Amusement prematurely terminated the contract entitling RJAM to payment until October 18, 1999, the amount of damages still needs to be addressed. While RJAM insists that damages can be determined at the appellate level, the trial court addressed the accounting and methods of distribution of funds only in the context of determining contractual liability. Since the actual amount of damages was not actually determined at trial, it is not properly before us at this time. Therefore, we remand the case to the trial court for a determination of the actual amount owed to RJAM.
 

 CONCLUSION
 

 For the foregoing reasons, we reverse the decision of the trial court and find that despite the modifications, the Compensation Agreement was valid. We further find that Miletello d/b/a LSM Amusement prematurely terminated the contract, and RJAM is entitled to damages as set forth above. Accordingly, we remand the case
 
 *288
 
 to the trial court for a determination of the amount owed to RJAM.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Edgar Mouton and Sam Mijalis settled their claims with Miletello and are not part of this litigation.
 

 [2]
 

 . During the business operation, $35,000.00, although the greater amount, was never paid to the Associates.
 

 [3]
 

 . The renewal option is inapplicable because, as stated earlier, the Compensation Agreement was terminated, even if done prematurely.