PITMAN, J.
| defendant Bobby Smith appeals the judgment of the trial court which found that he had breached a lease agreement and a noncompete agreement and that an asset purchase agreement was enforceable. Defendant also appeals that portion of the judgment which found that Plaintiffs, Leah Stroope and the Unopened Succession of Stephen Alexander, d/b/a Exact Precast, and Alexander Memorial, owed Defendant a balance of only $36,033.09 on. his recon-ventional demand. For the following reasons, we affirm.

FACTS

Defendant owned a business specializing in the creation of memorial graveyard monuments and vaults, as well as precast concrete forms. He built his business over 30 years. In 2013, he approached Plaintiffs, Stephen Alexander (a former employee), and his wife, Leah Stroope, about buying the business and leasing his building. Because Defendant was impatient to sell, he did not consult an attorney about the necessary transaction documents, but, instead, asked Ms. Stroope to prepare the contracts between them. Ms. Stroope has a law degree and is a licensed attorney in Texas, but has never practiced law. Plaintiffs took possession of the premises around December 20, 2013, while contract negotiations were ongoing.
After negotiations were complete, Plaintiffs prepared three contracts upon which the parties mutually agreed. The first was a commercial lease agreement wherein Plaintiffs leased from Defendant the property located at 2378 Hwy. 33 North, Ru-sten, Louisiana (“the property” or “the premises”), ¡¿which was Defendant’s place of business known as Eagle Vault and Smith Memorials.
*615 Plaintiffs agreed to pay Defendant rent of $4,500 per month. The lease payment was due on the first of each month, and the Plaintiffs agreed to pay a late payment penalty of 5% of the monthly lease amount, or $225 per month, for any lease payment not paid to Defendant by the tenth of the month. The parties agreed to alter the lease payment schedule for the first three months of 2014 as follows:
December 2013: Prorated lease payment of $1,596.76 deferred until April 1, 2014; no late payment penalty assessed. January 2014: Lease payment deferred until April 1, 2014; no late payment penalty assessed.
February 2014: Lease payment deferred until May 1, 2014; no late payment penalty assessed.
March 2014: Lease payment deferred until June 1, 2014; no late payment penalty assessed.
Default was defined in the contract to have occurred if the lessee failed to make three consecutive lease payments. The contract stated that, “In the event of such a default by Lessee, Lessor shall make written demand upon Lessee for payment of past due Lease payments in addition to the late payment penalty.” The contract also contained a section concerning title to the property and stated that the lessor agrees that, upon lessee paying the lease payments and observing and performing all of the terms and conditions of the lease that is its part to perform, the lessee may “peaceable (sic) and quietly have, hold, occupy and enjoy” the property in accordance |swith the terms of the lease, “without hindrance from Lessor or any persons lawfully claiming through Lessor.”
The second contract was an asset purchase agreement, which states in pertinent part as follows:
1. Purchase and Sale. Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, all of the tangible and intangible assets of Seller used in Seller’s precast concrete, burial vault and memorial/monument business (“Assets”), as more fully described below:
[[Image here]]
4. Purchase Price/Allocation of Basis. The purchase price for the Assets being purchased hereunder shall be the sum of $30,000.00, plus the assumption of the liabilities as described in Exhibit “B” attached hereto and incorporated herein by reference (the “Purchase Price”). The purchase price shall be allocated among the Assets as provided in Form ’ 8954 to be filed with the Internal Revenue Service following the closing on December 31, 2013 (the “Closiiig Date”).
5. Payment of Purchase Price. Buyer shall pay the purchase price to Seller as follows:
(a) $10,000.00 (ten thousand dollars) in cash to Seller on the closing Date; and
(b) $10,000.00 (ten thousand dollars) in cash to Seller on April 1, 2014; and
(c) $10,000.00 (ten thousand dollars) in cash to Seller on July 1, 2014; [.]
A list of the assets purchased was attached to the sales contract.
The third contract was a noncompete agreement in which Plaintiffs were to pay a total of $220,000, at a rate of $2,442.45 monthly, over a ten-year period, with 6% interest. This agreement was confected at Defendant’s insistence to avoid taxes on the sale of the assets. The contract specifically stated that:
14For the good and valuable consideration of $220,000, Bobby Smith hereby covenants and agrees to not compete *616 with the Company or its successors or assigns.[1]
[[Image here]]
The term “to not compete” shall mean that Bobby Smith shall not directly or indirectly compete with the Company by serving as an officer, owner, partner, director, agent, employee or consultant to or for any firm or entity engaged in a business similar to of competitive with the Company.
[[Image here]]
Should any part or portion of this Agreement be found by a court of competent jurisdiction to be invalid or unenforceable, then such part or portion shall be severed from this Agreement and the remaining part or portion of this Agreement shall remain in full force and effect.
All three contracts were signed by the parties on December 31, 2013, and Plaintiffs tendered the first $10,000 due to Defendant pursuant to the sale of assets.
Plaintiffs operated the business as Exact Precast Concrete and Monument, LLC, for approximately three months until, on March 20, 2014, Mr.' Alexander died. (Hereafter, both Ms. Stroope and her husband’s unopened succession will be collectively referred to simply as “Plaintiff’.) After her husband’s funeral, Ms. Stroope gathered the company books and visited her parents in Arkansas for moral support. She was trying to decide how best to proceed with the contracts that had already been entered into by the company in order to meet the obligations to her clients,
|5On March 28, 2014, Defendant learned that a monument company called Suhor Industries (“SI”) had picked up a truckload of materials from the property. He texted Plaintiff on April 1, 2014, inquiring about two monuments he had purchased. Plaintiff responded by text that she was transferring all the monument contracts to Louisiana Monument Company in Ster-lington so that they could be completed.
The next day, April 2, 2014, Plaintiff spoke to Defendant on the telephone and allegedly told him that there were no funds for any payment due to him. At that point in time, Plaintiff had paid no rent and had paid no installments under the noncompete agreement.[2] Plaintiff also allegedly told Defendant that she could not return to the property and that she had left the keys to the building on a desk. Defendant testified that, during that conversation, Plaintiff asked him if. he would be interested in talking to a man named Murphy, who owned Camden Monument Company, about a possible sale of inventory and equipment.
Defendant returned’ to the property on April 3, 2014, to find the electricity being disconnected and also discovered that the water had been disconnected. He found the building key that Plaintiff had left on the desk. The office had been cleaned out *617 and computer data removed. None of the employees worked after March 2014.
1 (¡Defendant assumed Plaintiff had abandoned the property, and he immediately reentered the property and embarked on a self-help mission allegedly to “help” mitigate damages, mainly to himself. He hired laborers and spent several weeks cleaning the property, allegedly so that it could be relet. He took 15 Doric burial vaults he had previously sold to Plaintiff, placed them on a truck and returned them to the Doric company in Illinois, hoping eventually to recover their purchase price. He later placed the value of these vaults at $34,000. During the month of April 2014, he was given the opportunity to do a small precast job; and, at the property, he produced 16 pieces of precast over a period of three or four days, for which he was paid between $17,000 and $20,000. He hired one of his former employees, who also worked for Plaintiff, to pour the precast job and deliver the product to the customer. He did not perform this work on Plaintiffs behalf, but on his own behalf, and he used the truck, which he had sold to Plaintiff, to deliver the work to the customer.-
On April 24, 2014, Plaintiff visited the premises during the time period while Defendant was working. The property was not rented to anyone else despite Defendant’s efforts to find a new tenant. •
As of April 1, 2014, Plaintiff owed Defendant between $25,000 and $40,000 on the three contracts. Because there were some accounts receivable owed in Bossier Parish to Exact Precast, Defendant filed a petition for garnishment under writs of sequestration. Pursuant to the petition for garnishment, approximately $28,000 of Plaintiffs funds were sequestered. . Plaintiff attempted to have the garnishment dismissed, but was 17denied. As a result of the sequestration of her funds, Plaintiff wqs unable to pay any of her creditors, including Defendant.
The garnishment in Bossier Parish prompted Plaintiff to file the instant suit in Lincoln Parish in May 2014. A curator ad hoc was appointed to represent the unopened succession of her husband as a plaintiff in the proceedings.
In her petition, Plaintiff alleged that Defendant had breached the three contracts and that those actions[1] resulted in damage to her. She alleged- that she did not abandon the leased premises or the business and that Defendant had acted in bad faith when he converted physical assets of the business and used the leased location for his own benefit. Further, she alleged that Defendant’s action in initiating the garnishment proceeding in Bossier Parish tied up approximately $28,000 in receivables and made it impossible for her to make future payments to him. She alleged a cause of action under the Unfair Trade Practices Act and prayed for damages and attorney fees.
In her petition, Plaintiff- had also requested that an injunction be issued and alleged that Defendant had entered the property without her permission, had loaded vault forms and all material related to vaults on a truck labeled “Doric,” and that she feared assets and inventory of the company were being irioved out of- state without her permission, at great loss and damage to her. She further alleged that Defendant was selling monuments, which she believed had a retail Value of $250,000, for some unknown purchase price, and that she had purchased them, for approximately $42,000. Also alleging all the other aforementioned acts of | «wrongdoing;, she asked the court to reiader an injunction prohibiting Defendant from removing, altering, damaging, disposing or encumbering any of the property, equipment, inventory, assets or her good name, and to immediately *618 return and account for any and all actions taken by him on the property. She also requested attorney fees and all costs of the proceedings. The injunction was issued, although no order was entered with regard to the Doric vaults or return of any assets. She was to post a bond of $20,000.
Plaintiffs father visited the property the next day and found that Defendant had placed a padlock on the gate and instructed him to leave. Plaintiff did not return to the premises until after the trial on the merits. She wrote Defendant a check for $15,096.77 in May 2014 to coyer the cost of leasing the property between December 2013 (prorated) and April 2014. ,
Defendant denied the allegations and filed a reconventional demand alleging that Plaintiff had breached the- contracts. He prayed that the trial court award him all amounts due him as a result of Plaintiffs default and any damages arising therefrom. He also filed amended reconven-tional demands and prayed that the trial court construe the three contracts together, reform them and find that the parties intended a sale of the assets for $250,000, and not a sale of the assets for $30,000 with a noncompete for $220,000.00.
At trial, Plaintiff testified that she did not intend to abandon the property, but only went to Arkansas for a short time for emotional support from her family. She testified she - took the business records with her so she could contact customers and finish billing and that she continued to do labusiness while in Arkansas. She denied ever giving Defendant any indication that she was abandoning the property and, in fact, stated that she was in negotiations to sell the business at a later-date.
Plaintiff also testified that she decided to negotiate the sale of some of the assets and tools to other competitors and to negotiate the sale and assignment of currently pending contracts. It was her position that she was never in default on any payments to Defendant and that she was trying to resolve some of the financial and personal issues in the wake of her husband’s death.
Plaintiff further testified that Defendant reentered the property at the beginning of April 2014 and began operating his own business. She asserted that these actions were breaches of the agreements between them. She stated that she never received notice from Defendant of late rental payments, as required by the contracts, and that she never defaulted as defined in the contracts.
Defendant testified regarding facts which led him to believe that Plaintiff had abandoned the property and the business, stating that, after Plaintiff abandoned the business, with contracts outstanding, he reentered the premises, fulfilled contracts and made business transactions for himself, admittedly using equipment that was subject to the asset purchase agreement. He also testified that he did so in an effort to mitigate the damages caused by Plaintiffs failure to make timely payments. He stated that he filed the suit in Bossier Parish because he believed Plaintiff was trying to abscond to Arkansas with the assets of the business without paying | iphim on the contracts, which he believed was his right since he had not yet been paid.
After the trial, the trial court rendered a ruling with extensive reasons for judgment. It found that Plaintiff' had not abandoned the premises and was not in default, as per the terms of the contracts, when Defendant reentered the property. It also found that, since Plaintiff was in the process of actively negotiating with another business to assign her position in the contracts, she had not abandoned, nor did she intend to abandon, the property or the *619 business assets. It further found that Defendant had resorted to self-help and breached the lease agreement, stating that his actions impeded Plaintiffs peaceful occupation and showed more than an intention merely to relet the property. In taking these actions, Defendant relinquished his right to future rents and claims. Further, by initiating the action in Bossier Parish when no default under the lease had occurred, and no notice of default and nonpayment had been made, Defendant was found to have impeded Plaintiffs ability to pay him the money owed. It also found that Defendant was entitled to rental payments for a portion of December 2013 and for the months of January, February, March and a portion of April 2014, declaring that, once he reentered the property, his right to rental payments under the lease terminated.
Although neither party raised the validity of the ten-year term of the noncompete contract, the trial court found that the language of that contract did not comply with La. R.S. 23:921, which provides for terms of only two years. However, since the noncompete contract contained a severance In clause, it was able to sever the ten-year period, allowing, the contract to conform to the statute with a maximum time limit of two years. It also concluded that Defendant breached the noncompete contract upon his reentry onto the property and his production of the precast job in April 2014. As a result, it found that Defendant was entitled to the monthly payments under the contract only from the date of its execution until the date he reentered the property and began competing with Plaintiff in violation of the agreement.
In regard to the parties’ requests for damages, the trial court found that neither had met their burden of proof. It found that Plaintiff did not meet her burden that Defendant converted assets for his own use or that he damaged or took certain assets from the business. Similarly, it found that Defendant did not prove that Plaintiff had damaged assets belonging to him, since it determined that' all the assets were Plaintiffs property.
The trial court further found that Defendant had failed to meet his burden of proof on the 'issue of reformation of the contracts. It found no evidence of mutual error in the writing of the contracts and that they were drafted exactly in accordance with Defendant’s wishes. It noted that Defendant’s intention was that the assets and equipment be sold for $30,000 for tax purposes and that he would receive $220,000 under the noncompete agreement. It found that, although Defendant asserted that the assets of the business were worth in excess of $200,000, he had not provided any proof of that assertion, except his unsubstantiated testimony and the results of |12internet searches. It, therefore, refused to reform the contracts to reflect a sale of assets of $250,000.
• For those reasons, the trial court found the three contracts valid and enforceable as written and that they should not be reformed.. Further, it found that Defendant had breached the lease agreement and the noncompete agreement by occupying the premises and competing with Plaintiff beginning on or about April 4, 2014. It also decreed that Plaintiff was recognized as the owner of all assets listed on the asset purchase agreement.
In regard to Defendant’s reconventional demand, the trial court made the following finding:
The Court awards the following amounts to Mr. Smith to be paid by plaintiffs to him:
Lease
$1,596.76 pro-rated December rent
*620 $4,500.00 January rent
$4,500.00 February rent
$4,500.00 March rent
$600 pro-rated April rent through April 4, 2014
Non-Compete
$2,442.45 January non-compete .payment
$2,442.45 February non-compete payment
$2,442.45 March non-compete payment
$325.66 pro-rated April non-compete payment
Asset Purchase
$10,000.00 First Asset Purchase payment
$10,000.00 Second Asset Purchase payment
$10,000.00 Third Asset Purchase payment
$3,471.23 Insurance paid on behalf of Plaintiffs
$4,309.86 movable property taxes
Plaintiffs are obligated for the liabilities listed in Exhibit B to the Asset Purchase Agreement attached hereto. Total Owed by the plaintiffs to the defendant=$61,129,86
LESS the following:
|1S$10,000.00 Asset Purchase payment paid by Plaintiffs on closing date
$15,096.77 paid by Plaintiffs on May 30, 2014
Total Credit=$25,096.77
Total Owed-Total Credit=$36,033.09=Balance due to defendant
The trial "court further determined that neither Plaintiff nor Defendant was entitled to damages since neither had met his/her burden of proof.
No attorney fees were awarded to either party, because the trial court determined that the contracts did not provide for such an award. Defendant was cast with all costs of the proceedings and has appealed this judgment.

DISCUSSION

The Lease

In his first assignment of error, Defendant argues that the trial court erred in concluding that he had breached the lease agreement. He contends that his entry upon the premises did not breach the lease since Plaintiff had abandoned the property; and, accordingly, he had the authority, as lessor, to enter the property and mitigate his damages. He argues that there is no clearer indication that Plaintiff intended to abandon the property than that she admitted she cancelled her insurance, discontinued the utilities, told him that she was leaving forever and did not return 'to the property at any time between April 1 and April 24, 2014. He claims the trial court overlooked her testimony when it ruled that she did not abandon the property.
Plaintiff argues that the trial court correctly found that she did not breach the lease by abandonment. She contends that, despite Defendant’s [ testimony to the contrary, she had no intention of permanently leaving the state. She testified that, the day after her husband’s funeral, she returned'to the business to make decisions and to work diligently to complete her current contracts by subcontracting them. Because she was not familiar with all aspects of the business and had limited knowledge of “underground utilities/” she began conversations with SI about selling assets to them. She also spoke to SI about possibly transferring contractual obligations to them. She argues that she never had any intent to abandon the busi *621 ness and that the first payment on the lease was not due until April 1, 2014, with a provision for a $225 late payment penalty per month for any lease payment not paid to Defendant by the tenth of- the month.
■ Plaintiff further argues that she was never able to make the first payment on the lease because ■ Defendant intervened, garnished her bank account without notice to her and took possession of the premises without following the proper judicial process. While she affirmed that she had a conversation with Defendant on April 2, 2014, she denied that the business, the rent or any money was discussed.
Plaintiff also argues that Defendant entered the property two or three days' after the rent was due on April 1,2014, and took complete possession of the property within days by bringing-in people to clean the premises in anticipation of reletting it. Plaintiff argues that the lessor’s obligation is to protect the lessee’s peaceful possession of the property for the duration of the lease, but that Defendant had padlocked the property and prevented her [1Rfrom having access to it even after a trial court entered a ruling that he could not encumber the property.
In Powell v. Cox, 92 So.2d 739 (La.App. 2d Cir.1957), this court stated that abandonment of property or of a right is the voluntary relinquishment thereof by its owner or holder, with the intention of terminating his ownership, possession and control, and without vesting ownership in any other person. The court also stated:
This court held in Donnell v. Gray, La. App., 34 So.2d 648 [(La.App. 2d Cir.1948)], that the abandonment of property by a tenant to such an extent as to vest title and control in the landlord involves both an act of abandonment and a specific intent to abandon. On a review of that decision -by the Supreme Court, doubt was expressed that the facts of the case justified a holding that the lessee’s silence, coupled with his failure to remove the equipment over a period of 14 months from defendant’s land, constituted an abandonment, the lessee’s actions negating any presumption of any intent on his part to abandon the property. 215 La. 497, 41 So.2d 66 [ (La.1949) ]. Cox, 92 So.2d at 742.
The Cox court also stated that the intention of the owner is a material factor for consideration and that abandonment of property, like the abandonment of a domicile and the acquisition of a new one, is made up of two elements — intent and action or inaction.
Defendant cited the more recent case of Richard v. Broussard, 495 So.2d 1291 (La.1986), in support of his actions. In that case, the court stated that, when the lessee breaches the lease by abandoning the premises, the lessor has the right to také possession of the premises as agent for the lessee and to relet the premises to a third party without canceling the lease or relieving the lessee of obligation under the lease ’ contract. However, the cáse also states that" the lessor must resort to judicial process to take ^possession of leased premises upon the lessee’s default' and may not engage in self-help except when the lessee has unjustifiably abandoned the leased premises. Broussard also addresses the issue of the unpaid rent if the lessees are thought to have abandoned the property. The Broussard court stated that, generally, when a lessee' defaults on a lease agreement, the lessor has two ¡options available: he may sue to cancel the lease and to recover accrued rentals due, or- he may sue to enforce the lease and to recover both accrued rentals and future accelerated rentals (if the lease contains an acceleration clause). These remedies are mutually exclusive. If the lessor elects to cancel the lease, the lease is terminated *622 and the lessor is entitled to return into possession, but he forfeits the right to all future rentals. On the other hand, if the lessor elects to enforce the lease, he may obtain a money judgment against the lessee based on the terms of the lease agreement, but the lease remains in effect and the lessee retains the right of occupancy for the remainder of the term of the lease. The Broussard court held that lessors were not entitled to recover rent from the lessees after the date the lessors occupied the premises for their own business purposes.
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). If the trial court or jury findings are reasonable in light of the record reviewed in its |17entirety, the court of appeal may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
In the case at bar, the trial court examined the evidence and found that Plaintiff had not abandoned the property before Defendant entered it and disturbed her possession. It noted that Plaintiff was not in default under the terms of the contract of lease at the time Defendant reentered the premises. Further, it stated in its reasons for judgment that Plaintiffs actions in actively trying to assign parts of the business to competitors and negotiating with another business to assign her position in outstanding contracts indicated that she did not abandon, nor did she intend to abandon, the premises and the business assets.
Based on the foregoing facts, we agree it was reasonable for the trial court to find that Defendant was unjustified in assuming, ten days after Plaintiffs husband’s death, that she intended to abandon the business they had just purchased. She was not in default under the lease, and the lease provided the method by which Defendant could demand any payment due him. Had he resorted to the judicial process available to him, these problems would have been avoided. We discern no manifest error. For these reasons, this assignment of error is without merit.

11SContractual interpretation and reformation

In his second assignment of error, Defendant argues that the trial court erred when it failed to interpret the contract of the asset sale for $30,000, and the noncompete agreement for $220,000, together, as a sale of the assets for the amount of $250,000, which he claims is the true nature of the contract between the parties. Defendant states that both parties testified that the true nature of the contract was a sale for $250,000, despite the form of a $30,0000 equipment sale and a $220,000 agreement to not compete. He argues that, for that reason, the trial court erred in failing to interpret the contracts in relation to each other. He points out that he testified about the conversation he had with Plaintiff on April 2, 2014, in which she spoke to him about his interest in talking to a man named Murphy concerning the possible sale of inventory and equipment, and notes that the conversation indicated that Plaintiff knew at that time that she had not made an agreement to acquire some $200,000 worth of equipment *623 for $30,000. Based on this evidence, Defendant claims the trial court ignored the basic principle of contract law in La. C.C. art. 2045 that “Interpretation of a contract is the determination of the common intent of the parties.” He argues that the words of the asset purchase agreement alone lead to absurd consequences proscribed by La. C.C. art. 2046. He further argues that La. C.C. art. 2053 requires the court to consider the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. He contends that the concept of equity is based on the principles that no one is allowed to |19take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. He states that it is clear from the facts of this case that there was no intent on the part of Plaintiff and Defendant that there be a price of $30,000 for all the equipment involved in the transaction and that, when the writings are construed together, the contract should be deemed as a sale for $250,000.
Plaintiff argues that the contracts were clear and unambiguous and led to no absurd consequences. Further, Plaintiff contends that Defendant had every opportunity to have the contracts assessed by an attorney prior to his decision to sign them, but did not. She points out that Defendant was the person who negotiated the addition of the noncompete contract and wanted it valued at $220,000 in an effort to ease his tax burden. It was only after her husband’s death that Defendant reevaluated his decision and asked the trial court to read the sale of assets and the noncompete contracts as one. She points out that there were no problems with the implementation of any of the contracts until her husband’s death.
Contract interpretation is a question of law, subject to de novo review on appeal. Total Minatome Corp. v. Union Texas Products Corp., 33,433 (La.App.2d Cir.8/23/00), 766 So.2d 685.
Sale is a contract - whereby a person transfers ownership of a thing to another for a price in money. The thing, the price and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2439. Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet | ^delivered nor the price paid. La. C.C. art. 2456. The seller must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against the seller. La. C.C. art. 2474. The seller is bound to deliver the thing sold and to warrant to the buyer ownership and peaceful possession of, and the absence of hidden defects in, that thing. La. C.C. art. 2475. Delivery of a movable takes place by handing it over to the buyer. La. C.C. art. 2477.
The buyer is bound to pay-the price and to take delivery of the thing. La. C.C. art. 2549. Payment of the price is due at the time and place stipulated in the contract, or at the time and place of delivery if the contract contains no such stipulation. La. C.C. art. 2550. If the buyer fails to pay the price, the seller may sue for dissolution of the sale. La. C.C. art. 2561. Revision Comment (c) to that article states that after perfection of the sale, where the buyer fails to pay the price, the seller may either sue for payment of the price or for dissolution under this article. If there is a judicial dissolution of the sale, the property is restored to the seller and the buyer is discharged from his obligation to pay the price. If the buyer has paid a part of the price, he is *624 entitled to have that part returned to him. Sliman v. McBee, 311 So.2d 248 (La.1975).
La. R.S. 28:921(B) concerns noncompete contracts and states as follows:
B. Any person, including a corporation and the individual shareholders of such corporation, who sells the goodwill of a business may agree with the buyer that the seller or other interested party in the transaction, will refrain from carrying on or engaging in a business similar to the business being sold or from soliciting customers of the business being sold within a |⅞1 specified parish or parishes,' or municipality or municipalities, or parts thereof, so long as the buyer, or any person deriving title to the goodwill from him, carries on a like business therein, not to exceed a period of two years from the date of sale.
In Pattridge v. Starks, 50,135 (La.App.2d Cir.11/18/15), 181 So.3d 192, writ denied, 15-2325 (La.2/19/16), 187 So.3d 463, the court stated as follows:
A non-competition agreement is a contract between the parties and should be construed according to the general rules of interpretation of contracts. La. C.C. arts. 2045-2057; - SWAT 24 Shreveport Bossier, Inc. v. Bond, 2000-1695 (La.06/29/01), 808 So.2d 294. A contract establishes the law between the parties, and the' purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art. 2045. Ordinarily, the meaning and intent of the parties to a written instrument should be determined within thé four .corners of the document and its terms should not be explained or contradicted by extrinsic evidence. RJAM, Inc. v. Miletello, 45,176 (La.App.2d Cir.04/14/10), 44 So.3d 283, writ denied, 2010-1127 (La.09/17/10), 45 So.3d 1049. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. A clear and unambiguous clause in a contract should not be disregarded so as to pursue its spirit; it is not the court’s duty to bend the meaning of the words of. a contract into harmony with a supposed reasonable intention of the parties. Clovelly Oil Co. v. Midstates Petroleum Co., 2012-2055 (La.03/19/13), 112 So.3d 187 at 192. Courts must interpret contracts . in a common-sense fashion, giving the words of the contract their common and usual significance. Id. Each provision must be interpreted in light of the other provisions of the contract so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
In John Paul Sapir, LLC v. Yum! Brands, Inc., 12-0824 (La.App. 4th Cir.12/5/12), 106 So.3d 646, writ denied, 13-0043 (La.2/22/13), 108 So.3d 775, the court stated that a contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions or the intent of the parties | ^cannot be ascertained from the language employed. In that case, the court also stated that the Louisiana Supreme Court has previously held that the rules of contract construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of new contract when the terms express with sufficient clearness the parties’ intent. Id. at 652, citing Campbell v. Melton, 01-2578 (La.5/14/02), 817 So.2d 69. Additionally, the fact that one party may create a dispute about the meaning of a contractual provision does not render the provision ambiguous. Id. The Louisiana Supreme Court has also *625 repeatedly explained that it is not within the province of courts to relieve parties of what they later decide is a bad bargain. If the contract agreement is not ambiguous, the party arguing ambiguity is still bound by its terms, even if it no longer likes the terms. Id. at 652, citing Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970).
In the case at bar, the trial court found that Defendant had failed to meet his burden of proof on the issue of reformation of the contracts to reflect that the parties intended a sale of the assets for the price of $250,000. It noted that there was no evidence of mutual error , in the writing of the contracts and that, in fact, the evidence showed that the contracts were drafted exactly as Defendant wanted them drafted.
Without consulting an attorney regarding the possible effect of the terms of these contracts, Defendant asked Plaintiff to draft the contracts as a sale of assets for $30,000 (for his tax purposes) and a noncompete contract for $220,000. There was no mutual error in the confection or signing of laathese agreements. In fact, until Plaintiff’s husband’s death, all of the parties were satisfied with the agreements between them.
The rules of contractual interpretation apply in this case. The words in the contract of sale were, clear, i.e., that Defendant sold the assets listed in the descriptive list to Plaintiffs for the sum of $30,000, and they made the first payment of $10,000. No further interpretation may be made of the parties’ intent. If Defendant did not intend this sale to occur for that price, no matter what his reason, he should not have signed the contract indicating he agreed to its terms.
At Defendant’s insistence, Plaintiff created the noncompete contract by which Plaintiffs agreed to pay him the total sum of $220,000 for his agreement not to compete with them in the precast concrete business. Those are the words in the contract. The fact that the contract contained a severance clause was noted by the trial court when it pointed out that the noncom-pete clause was null as a result of its term being ten years instead of the two years allowed by La, R.S. 23:921. The effect of the severance clause could only be that Defendant’s agreement not. to compete would be reduced to the two years provided by the statute, but that the price for that noncompete agreement would still be owed. However, the contract says nothing about the money due under the noncom-pete agreement actually being payment for the assets sold in the asset purchase agreement. The trial court interpreted the contract as written and felt no need to make reference to extrinsic evidence provided by Defeiidant that he expected payment of the noncompete agreement to cover the deficiency in the price of the sale of la^the assets because he desired to avoid payment of taxes. Defendant made a bad deal, and it was not the trial court’s duty to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties.
For the foregoing reasons, this assignment of error is without merit.

Damages

In his third assignment of error, Defendant argues that the trial court erred by failing to award him the correct amount of damages under the contracts, which he claims to be $128,538.96. This figure includes lease payments and payments due under the noncompete agreement through the date of trial in December 2014. He argues that the trial court incorrectly found he was entitled to recover' payments due under the noncompete agreement only for the months allowed for three reasons: (1) the payments were part of the agreed Sales price,’ (2) he was never *626 in a business that could compete and (3) an agreement not to compete becomes unenforceable if the buyer does not carry on the business sold, citing La. R.S. 23:921(B).
Plaintiff argues the trial court properly ruled that Defendant had violated the non-compete clause because, after he took possession of the property from her, he completed a precast job at the property using the equipment purchased by her. She points out that Defendant’s testimony revealed he had received between $17,000 and $20,000 for the job and this completion of the precast job was a direct breach of the noncompete agreement.
I «¡Plaintiff further argues that Defendant’s garnishment proceeding in Bossier Parish resulted in approximately $28,000 being taken from her business account, preventing her from being able to operate the business, to pay bills and subcontractors or to complete some planned monument contracts. She also argues that Defendant not only took possession of the business and the accounts, he began selling business assets. Defendant admitting shipping some molds to Doric, from which he intended to receive compensation. Defendant valued the Doric Vault Forms at $34,000. Plaintiff argues that those particular forms were gone on or before April 24, 2014.
Plaintiff argues that the trial court propr erly awarded damages in this case. She argues that, although Defendant alleged that he was entitled to damages in the amount of $128,536.96, which included the rent and noncompete payments through the date of the trial, the damages demanded do not take into account that Defendant breached the lease and noncompete agreement in April 2014. She also argues that the total demanded by Defendant includes $15,000 for lid racks and $10,000 for vault lowering devices which Plaintiff had acquired in the asset purchase agreement.
After conducting a de novo review of the record, we find that Defendant breached all of the contracts he signed within four months of their confection. Although the trial court found that the asset purchase agreement was valid and enforceable, it did not find that Plaintiff had proven that Defendant had committed any wrongdoing with regard to this |2ficontract,[3] but only that the sale of all of the assets listed on the appendix was to be for the price of $30,000.
Despite the fact that Plaintiff and her husband had only begun paying the asset purchase price of $30,000 by paying Defendant $10,000 on December 31, 2013, in accordance with the contract and the law, the sale was complete upon agreement of the thing, the price and consent. Defendant had no legal right to take Plaintiffs property or use it without resort to judicial process. This is merely one example of Defendant’s breach of the contract of the sale of assets and why it is equitable to assert the validity of the contract against him for the agreed upon price of $30,000.
Defendant also breached the lease agreement. His duty was to provide the lessee with peaceful possession of the leased premises, but, instead, he entered the property in April 2014 and took it back *627 for his own purposes. In fact, he locked Plaintiff out even though her movable property was still located on the premises. In addition, the record shows that he secured a precast concrete job and used Plaintiffs forms and truck, which he had sold to her, to complete and deliver the product. The date Defendant was deemed to have entered the property, by his own admission with the intent to reclaim it, clean it up and relet it, was one day past the first day that rent was to be paid, and the date for the imposition of the $225 12.7late fee had not yet been reached. Plaintiff still had time to make the payment for the rental due on April 1 or April 10, 2014, and was not in default under the terms of the lease, which stated that default occurred when she failed to pay three consecutive months of rent. Defendant never gave Plaintiff notice or made a demand upon her for payment under the lease prior to his reentering the leased property and upsetting her peaceful possession. Further, he filed the petition for garnishment by sequestration in Bossier Parish on April 7 or 8, 2014, and Plaintiff was unable to pay him after that. His assumption that he had the right to self-help because he believed she had abandoned the premises was misguided. Therefore, we find no error in the ruling of the trial court that Defendant was only entitled to the payment for rental of the property from the prorated amount for December 2013 through April 4, 2014.
Defendant breached the noncom-pete contract when he entered the premises in April 2014 and performed the precast concrete job for which he earned $17,000 to $20,000. By his own admission, Defendant entered the property, hired someone who had worked with him before, poured the concrete to complete the job and then used Plaintiffs truck to deliver the completed precast form. This was a direct violation and breach of the noncompete contract he signed four months before and is what he specifically agreed not to do in exchange for the payment of $220,000 over a ten-year period. There is no other way to interpret these actions except as a breach of the noncompete contract. For these reasons, we find that the trial court correctly assessed Plaintiff with the payments under the | ¡¡¿noncompete agreement only for those months when Defendant refrained from competing against them-January through March 2014, and a prorated amount for April 2014.
For the foregoing reasons, we find no error in the ruling of the trial court and this assignment of error is without merit.

CONCLUSION

The judgment of the trial court in favor of Plaintiffs Leah Stroope and The Unopened Succession of Stephen Alexander, D/B/A Exact Precast, and Alexander Memorial, and against Defendant Bobby Smith, finding that .the three contracts at issue in this case are valid and enforceable and should not be reformed is affirmed in its entirety. The finding that Defendant Bobby. Smith breached the lease and non-compete agreements and, thus, is entitled to damages for rent and the noncompete payments only for the prorated months at issue. and the three months of January, February and March 2014 is affirmed. The portion of the judgment finding that the asset purchase agreement is valid and enforceable and that, for the total amount of $30,000, Plaintiff is the owner of all of the assets listed on Exhibit. A of that agreement, is affirmed. Costs of this appeal are assessed against Defendant Bobby Smith.
AFFIRMED.
CARAWAY, J., dissents with written reasons.

. The noncompete agreement lacks the same language as the other two contracts in that it does not contain language expressly deferring payments until April 1, 2014. However, Defendant never notified Plaintiffs that any sums were due, or demanded any payments, under the noncompete contract prior to April 1, 2014.

. As stated! earlier, the first rental payment was not due until April 1, 2014, and the lease contained a clause stating that, if payment was made after die tenth of each month, a penalty of $225 would be assessed, but the lessee would not be in default until she failed to pay the rent for three consecutive months. Defendant never made written demand upon the lessee for payment of the rent due, or gave her any indication that he was, talcing any action with regard to the property, as was required by the lease.

. We note that, according to the record, both at trial and at the hearing for injunction, Defendant admitted taking the Doric burial vault forms on or about April 22, 2014, which he had sold to Plaintiff, and returning them to the Doric company, expecting payment to be sent to him. The vaults were listed in the appendix to the asset purchase agreement. Plaintiff testified that someone had offered to buy the forms for $32,500. Defendant had testified that they were worth $34,000.00. Plaintiff also testified that the forms had been on the property and then they were not there.